**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

HYUNDAI STEEL COMPANY,

       Plaintiff,

   v.

UNITED STATES,

       Defendant,

         and

NUCOR CORPORATION,
SSAB ENTERPRISES, INC., and
STEEL DYNAMICS, INC.

       Defendant-Intervenors.

**NON-CONFIDENTIAL**
Proprietary Information
Removed from Pages 3, 6,
15, 16, 20, 29, 30, and 34.

Court No. 21-00536

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF ITS
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

March 21, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Hyundai Steel Company*

14013807–1

## TABLE OF CONTENTS

I.   STATEMENT PURSUANT TO RULE 56.2 ...................................................................1

II.  ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
     ADMINISTRATIVE DETERMINATION ...................................................................2

III. STATEMENT OF FACTS ........................................................................................2

IV.  SUMMARY OF ARGUMENT ...................................................................................8

V.   STANDARD OF REVIEW ......................................................................................10

VI.  ARGUMENT .........................................................................................................10

    A.   Commerce's Determination That The GOK's Provision Of Port Usage Rights
          Provides A Countervailable Benefit Is Unsupported By Substantial Evidence And
          Is Otherwise Contrary To Law. ..................................................................10

        1.   There Is No Evidence That The Port Usage Rights Were Excessive And
               Thus They Provided No Benefit Under This Program As Alleged By
               Petitioner And Initiated By Commerce. ..............................................11

        2.   Port Usage Rights Are Received As Repayment Of A Debt And Thus Do
               Not Provide A Benefit To Hyundai Steel. ............................................19

    B.   Commerce's Determination That Hyundai Steel's Sewerage Usage Fees Are
          Countervailable Is Unsupported By Substantial Evidence And Is Otherwise Not In
          Accordance With Law. ...............................................................................26

        1.   Hyundai Steel's Payment of Sewerage Fees Was Fully In Accordance
               With Korean Law And Thus Commerce's Finding To The Contrary Is
               Not Supported By Substantial Evidence. ..............................................27

            a.   Hyundai Steel's Sewerage Fees Were Calculated Pursuant To Korean
                    Law. ...............................................................................................27

            b.   Commerce's Conclusion That Korean Law Did Not Provide For
                    Hyundai Steel's Sewerage Fee Reductions Is Not Supported By
                    Substantial Evidence And Is Contrary To Law. ...............................31

        2.   The Amount Of The Sewerage Fee Reductions Received By Hyundai
               Steel Is Consistent With Korean Law. ..................................................32

    C.   Hyundai Steel Did Not Receive A Countervailable Subsidy In Connection With
          Its Payment Of  Sewerage Usage Fees. .......................................................34

        1.   Hyundai Steel Received No Financial Contribution Because The
               Government Of Korea Did Not Forego Any Revenue Otherwise Due....35

        2.   Hyundai Steel Did Not Receive A Countervailable Benefit Because The
               Sewerage Usage Fees Were Directly Proportional To Its Usage Of The
               Public Sewerage System. .....................................................................37

VII. CONCLUSION AND RELIEF REQUESTED ...........................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corporation v. United States*,
192 F.3d 1367 (Fed. Cir. 1999)......................................................................12, 13, 18, 19

*Armstrong v. United States*,
364 U.S. 40 (1960)..............................................................................................................21

*Commc'ns Workers of Am. Loc. 4123 v. U.S. Sec'y of Labor*,
518 F. Supp. 3d 1342 (Ct. Int'l Trade 2021) .....................................................................32

*Corley v. United States*,
556 U.S. 303 (2009)............................................................................................................37

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)............................................................................................................21

*Hibbs v. Winn*,
542 U.S. 88 (2004)..............................................................................................................37

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009)..........................................................................................16

*Government of Sri Lanka v. United States*,
308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ............................................................ *passim*

*Jinan Yipin Corp. v. United States*,
31 CIT 1901, 526 F. Supp. 2d 1347 (2007) .......................................................................31

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004)..........................................................................................16

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013)..........................................................................................32

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................................10

19 U.S.C. § 1671(6).............................................................................................................25

19 U.S.C. § 1677(5) ...........................................................................10, 22, 35, 37, 38, 39

**U.S. Constitution**

U.S. Const. amend. V ...................................................................................................21

**Regulations**

19 C.F.R. § 351.106(c) .............................................................................................7, 10

19 C.F.R. § 351.503(b) ............................................................................................19, 38

19 C.F.R. § 351.504 ....................................................................................................22

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. REP.
    NO. 103–316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ......................32

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea:*
    *Preliminary Results of Countervailing Duty Administrative Review, 2019*, 86
    Fed. Reg. 55,572 (Dep't Commerce Oct. 6, 2021) ...........................................26, 27

*Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea:*
    *Final Results of Countervailing Duty Administrative Review; Calendar Year*
    *2018*, 85 Fed. Reg. 84,296 (Dep't Commerce Dec. 28, 2020) .................................8

*Certain Cut-To-Length Carbon-Quality Steel Plate From the Republic of Korea:*
    *Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86
    Fed. Reg. 34,718 (Dep't Commerce June 30, 2021) ........................................26, 27

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final*
    *Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg.
    64,122 (Dep't Commerce Oct. 9, 2020) ...........................................................11, 15

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final*
    *Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg.
    47,621 (Dep't Commerce Aug. 26, 2021) .................................................... *passim*

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Preliminary*
    *Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg.
    10,533 (Dep't Commerce Feb. 22, 2021) ...........................................................6, 7

*Certain Quartz Surface Products From the Republic of Turkey: Final Affirmative*
    *Countervailing Duty Determination and Final Affirmative Determination of*
    *Critical Circumstances, In Part*, 85 Fed. Reg. 25,400 (Dep't Commerce May
    1, 2020) ...........................................................................................................16, 17

*Certain Quartz Surface Products From the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 84 Fed. Reg. 54,841 (Dep't Commerce Oct. 11, 2019) ................................................................16, 17

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ........................38

*Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011*, 79 Fed. Reg. 5,378 (Dep't Commerce Jan. 31, 2014) ..........................................12

*Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 Fed. Reg. 55,241 (Dep't Commerce Sept. 10, 2013) ................................12

*Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 Fed. Reg. 37,338 (Dep't Commerce July 9, 1993) .........................................12, 13, 14, 18

*Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils From the Republic of Korea*, 64 Fed. Reg. 30,636 (Dep't Commerce June 8, 1999) .....................................................13, 17, 18, 24

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712 (Dep't Commerce Dec. 11, 2019) ................................................2

*Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea*, 67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002) ............................................12, 14, 16, 18

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 Fed. Reg. 38,565 (Dep't Commerce July 13, 2007) .......................................... 14-16

*Supercalendered Paper From Canada: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015)...........................16, 17

*Supercalendered Paper From Canada: Preliminary Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 45,951 (Dep't Commerce Aug. 3, 2015)...................16, 17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>   Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br>    and<br><br>NUCOR CORPORATION,<br>SSAB ENTERPRISES, INC., and<br>STEEL DYNAMICS, INC.<br><br>   Defendant-Intervenors. | **NON-CONFIDENTIAL**<br>Proprietary Information<br>Removed from Pages 3, 6,<br>15, 16, 20, 29, 30, and 34.<br><br>Court No. 21-00536 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

  In accordance with Rule 56.2 of the Rules of this Court, and the Scheduling Order, ECF

No. 31, Plaintiff Hyundai Steel Company ("Hyundai Steel" or "Plaintiff") files this brief in

support of its Rule 56.2 Motion For Judgment Upon the Agency Record. As discussed below,

the U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by substantial

evidence and otherwise not in accordance with law.

**I.  STATEMENT PURSUANT TO RULE 56.2**

  The administrative determination under review is Commerce's *Final Results* in the

countervailing duty ("CVD") administrative review of certain hot-rolled steel flat products

("HR" or "subject merchandise") from the Republic of Korea, which covered entries of subject

merchandise into the United States between January 1, 2018 and December 31, 2018. *Certain*

*Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing*

1

*Duty Administrative Review; 2018*, 86 Fed. Reg. 47,621 (Dep't Commerce Aug. 26, 2021) ("*Final Results*"), and accompanying Issues and Decision Memorandum ("*Final Results Decision Memo*").

## II.     ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1.     Whether Commerce's determination that Hyundai Steel received a countervailable benefit from the provision of port usage rights by the Government of Korea ("GOK") is unsupported by substantial evidence and otherwise not in accordance with law, where the estimated value of the port usage rights did not exceed Hyundai Steel's construction costs for building the port and were provided as compensation for Hyundai Steel being required to revert ownership of the port to the GOK after Hyundai Steel completed construction.

2.     Whether Commerce's determination that Hyundai Steel received a financial contribution from the GOK in connection with its payment of sewerage fees is unsupported by substantial evidence and otherwise not in accordance with law where Hyundai Steel paid the full amount of sewerage fees based on its proven usage as permitted under Korean law.

3.     Whether Commerce's determination that Hyundai Steel received a countervailable benefit from the GOK in connection with its payment of sewerage fees is unsupported by substantial evidence and otherwise not in accordance with law where the amount Hyundai Steel paid in sewerage fees was directly proportional to the amount of sewerage it discharged into the public sewer system.

## III.     STATEMENT OF FACTS

On December 11, 2019, Commerce initiated an administrative review of the CVD order on HR from Korea. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*,

84 Fed. Reg. 67,712 (Dep't Commerce Dec. 11, 2019).  Commerce selected Hyundai Steel as the

mandatory respondents in this administrative review.  *See* P.R. 34.

In response to the "Programs Not Previously Used Or Provided No Measurable Benefits"

section of the initial questionnaire, Hyundai Steel reported that between March 2003 and January

2007, it paid for the construction of a port facility at North Incheon Harbor and received

reimbursements from the GOK between 2004 and 2007.  C.R. 51 at 41.   Ownership of the port

facility reverted to the GOK in 2007 as required under Article 15 of the Harbor Act.  C.R. 102 at

Exhibit SQ1 K-Water-1.  However, because Hyundai Steel had financed and constructed the port

facility, Hyundai Steel acquired the right to operate and use the port for its own operations, as

well as collect fees from third-party users (although no other party had used the harbor).  C.R. 51

at 43.  These port usage rights were provided for a period of [                              ].  *Id.*

Hyundai Steel also received berthing income from shipping companies and reported the total

amount it received from 2007 (when construction of the port was complete) through the 2018

period of review ("POR").  *Id.* at 43; C.R. 68 at Exhibit G-3.

Hyundai Steel also responded to the "Programs Not Previously Used Or Provided No

Measurable Benefits" section of the initial questionnaire, which listed the program "Reduction

for Sewerage Usage Fee."  C.R. 51 at 56; C.R. 69 at Exhibit G-23.  In disclosing its participation

in this program, Hyundai Steel reported that, because it uses a significant amount of water for

cooling machinery and merchandise at very high temperatures, a significant volume of water it

consumes is vaporized in the cooling process, thereby reducing Hyundai Steel's volume of

wastewater.  C.R. 51 at 57.  Pursuant to Article 21(1)(7) of the Regulation on Sewerage Usage of

the Incheon Metropolitan City and Article 9 of the Enforcement Regulation, Hyundai Steel

received a reduction in its sewerage usage fees such that it was only charged for the wastewater it introduced into the Incheon City sewerage system.  C.R. 69 at Exhibit G-23.

On March 30, 2020, the GOK filed its response to Commerce's initial questionnaire, corroborating Hyundai Steel's reporting on both the Incheon Harbor and sewerage usage programs.  C.R. 10 at 105.  Regarding the Incheon Harbor program, the GOK reported the amount of direct reimbursements Hyundai Steel received for constructing the port between 2004 and 2007 and noted that Commerce had previously examined this program in prior proceedings to find that Hyundai Steel received no measurable benefit from these payments.  C.R. 10 at 106.

Regarding Hyundai Steel's sewerage usage fees, the GOK stated that pursuant to Article 36 of the Presidential Decree to the Sewerage Act, sewerage fees "must be calculated on the basis of the amount and type of the sewerage water drained down the system."  C.R. 10 at 133. Authority to calculate and charge such fees is delegated to regional and local governments.  *Id.* at 135.  However, the GOK explained that users of the public sewerage system, such as households, normally do not have meters to gauge the actual amount of sewerage they introduce into the public system.  Thus, for practical reasons, regional authorities will generally use the volume of clean water consumed from the public system as a proxy for the volume of wastewater introduced into the public system in order to calculate the sewerage usage fee.  *Id.* at 133.

Notwithstanding the general practice, the GOK stated that if an entity can demonstrate that the volume of wastewater it introduces into the public system is less than the volume of clean water it consumes, the local authorities will base the sewerage usage fees on the volume of sewerage that the entity actually introduced into the public system.  *Id* at 137.  The GOK explained that Hyundai Steel was able to demonstrate through a report published by an

independent third party that the volume of wastewater that it introduced into the public system was far less than the volume of clean water that it consumed.  *Id.* at 136.

Once the Incheon municipal authority reviewed and approved Hyundai Steel's application, Hyundai Steel's proven wastewater volume was used as the basis for its sewerage fees.  *Id.* at 137.  The GOK provided all of the relevant statutes and regulations, as well as Hyundai Steel's application, approval letter, and third-party report.  C.R. 19 at Exhibit SEWER-1 to SEWER-4.  Both Hyundai Steel's application and approval letter cite the relevant regulations under which Hyundai Steel's fee reductions were approved—specifically, Article 21 of the Regulation on Sewerage Usage of the Incheon Metropolitan City and Article 9 of the Enforcement Regulation.  *Id.*

On January 8, 2021, Commerce issued supplemental questionnaires to both Hyundai Steel and the GOK regarding the Incheon Harbor program.  P.R. 117; P.R. 118.  On January 21, 2021, Hyundai Steel timely responded to the Department's supplemental questionnaire.  C.R. 165.  In these responses, Hyundai Steel explained that it only collected "berthing" fees and described the nature of certain other fees that Hyundai Steel could have collected, but did not. *Id.* at 1-14.  Although Hyundai Steel maintained that these other fees it could have, but did not collect were not benefits, it provided Commerce with a worksheet demonstrating the calculation of these additional fees (harbor exclusive usage fees).  *Id.* at Exhibit G-30.

On January 21, 2021, the GOK also timely responded to Commerce's supplemental questionnaire on the Incheon Harbor program, which provided a detailed explanation of how these "fees" that Hyundai Steel could have, but did not, collect were calculated.  *See* C.R. 163 at 3, 15-17; C.R. 164 at PPP-4.  In its response, the GOK described in great detail how Hyundai Steel's reimbursement schedule was calculated based on the total costs it incurred to build the

5

port.  Specifically, the GOK calculated the period during which Hyundai Steel would be entitled to its port usage rights—that is, the ability to use and operate the port and collect certain fees from third parties until it recuperated its construction costs.  As the GOK described, the formula used to calculate the term of the agreement between Hyundai Steel and the GOK consists of the following elements: (i) completion year of the construction, (ii) end year of the time period, (iii) the amount of the original investment in construction, (iv) revenue earned through operating the wharf on an annual basis, (v) annual operating costs, and (vi) revenue earned through ancillary business.  C.R. 163 at 7.

The agreement between Hyundai Steel and the GOK includes estimates of the amount of berthing and unloading fees Hyundai Steel could collect until it was reimbursed for the costs of constructing the port.  C.R. 65-67 at Exhibit G-1, Exhibit G-2.  The agreement estimates the volume and type of cargo for which Hyundai Steel could charge unloading fees, and multiplied those by the projected future unit prices to produce a reimbursement schedule.  *Id.*  In addition, the reimbursement schedule also factored in estimated future operating costs.  *Id.*  Considering all of these factors, Hyundai Steel and the GOK estimated that it would take **[**

**]** for Hyundai Steel to fully recoup its costs for constructing the port.

Commerce issued its *Preliminary Results* on February 16, 2021, which were published in the Federal Register on February 22, 2021.  *See Certain Hot-Rolled Steel Flat Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 10,533 (Dep't Commerce Feb. 22, 2021) ("*Preliminary Results*") and accompanying Decision Memorandum, P.R. 147; P.R. 146.  Commerce preliminarily determined that both the provision of port usage rights at Incheon Harbor and Hyundai Steel's sewerage fees constituted countervailable subsidies.  P.R. 146 at 14-18.  For each of these "programs,"

6

Commerce calculated an *ad valorem* subsidy rate of 0.01 percent.  *Id.*  In total, Commerce preliminarily determined that Hyundai Steel received a countervailable subsidy rate of 0.51 percent *ad valorem*.  P.R. 147.  This was just over the *de minimis* threshold under Commerce's regulations.  *See* 19 C.F.R. § 351.106(c).

On July 2, 2021, Hyundai Steel filed its case brief, arguing that Commerce's determination that Hyundai Steel's port usage rights at Incheon Harbor and its sewerage usage fees were countervailable was in error.  First, Hyundai Steel argued that Commerce failed to properly consider Hyundai Steel's port usage rights in the context of the costs Hyundai Steel incurred building the port at Incheon Harbor.  *See* C.R. 191 at 12.  Specifically, Hyundai Steel argued that Commerce's analysis of the compensation Hyundai Steel received for building and then ceding ownership of the port failed to address whether said compensation was excessive as is required under Commerce's precedents.  *Id.* at 4-5.  Second, Hyundai Steel argued that Commerce erred in countervailing Hyundai Steel's sewerage fees because Hyundai Steel was charged proportionally with its use of the public sewerage system, which is consistent with the statutes and regulations in Korea.  *Id.* at 24.  Thus, Hyundai Steel argued that Commerce erred in determining that the sewerage fee reductions constituted a financial contribution in the form of "revenue foregone" and in determining that there was a benefit to Hyundai Steel.  *Id.*

On August 20, 2021, Commerce issued the *Final Results*, which were published in the Federal Register on August 26, 2021.  *See* P.R. 177.  In the *Final Results*, Commerce continued to find that Hyundai Steel's port usage rights and sewerage fee reductions were countervailable.  P.R. 176 at 19.  Regarding Hyundai Steel's port usage rights, Commerce denied that Hyundai Steel's right to collect usage fees should be viewed in light of Hyundai Steel's substantial construction costs and stated that its determination in the instant proceeding was consistent with

its precedents.   *Id.* at 21.   Commerce also rejected Hyundai Steel's arguments regarding its

sewerage usage fees, quoting the reasoning it gave for rejecting similar arguments in *Certain*

*Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of*

*Countervailing Duty Administrative Review; Calendar Year 2018*, 85 Fed. Reg. 84,296 (Dep't

Commerce Dec. 28, 2020), and accompanying Issues and Decision Memorandum at Comment 6

("*CTL Plate from Korea 2018*").   As it did in that case, Commerce stated that none of the legal

provisions in Korea cited by Hyundai Steel or the GOK "prescribe for the situation under which

Hyundai Steel qualified for its sewerage fee reduction, or the amount of the reduction received

by Hyundai Steel."   P.R. 176 at 26.   Commerce found that these legal provisions "do not

explicitly provide that entities may claim a reduction in their overall water bill with regard to the

amount of sewage water discharged" and, therefore, contrary to the GOK's explanation, "the

basis under which Hyundai Steel received a sewerage fee reduction" was an "arrangement

unique to {Hyundai Steel} and not otherwise contemplated under the provisions of Korean law

on our record."   *Id.*   Commerce therefore concluded that the reduction of Hyundai Steel's

sewerage fees constitutes revenue foregone and is *de facto* specific.   *Id.* (citing 19 U.S.C. §

1677(5)(E), (5A)(D)(iii)(I)).

In the *Final Results*, Commerce continued to calculate an *ad valorem* subsidy rate of 0.51

percent for Hyundai Steel, just over *de minimis*.   P.R. 177.   This appeal followed.

## IV.   <u>SUMMARY OF ARGUMENT</u>

In the *Final Results*, Commerce had no legal basis to find that Hyundai Steel received a

countervailable benefit from the GOK's provision of port usage rights to compensate Hyundai

Steel for the construction costs it incurred in building the Incheon North Harbor port prior to

reverting ownership to the GOK.   Commerce's decision ignores its own practice with respect to

port usage programs in Korea where it has found that port usage rights may be countervailable

only if the resulting benefit was "excessive."  Commerce has consistently applied this excessive

benefit framework in numerous cases but did not do so in Hyundai Steel's case.  When this

excessive benefit standard is applied, it is clear that Hyundai Steel's port usage rights are not

excessive and were calculated to last only as long as necessary for Hyundai Steel to recoup the

costs incurred in constructing the port.  Thus, under Commerce's own standard, Hyundai Steel's

port usage rights did not provide a countervailable benefit.

However, even if the "excessive benefit" standard was not the applicable standard, there

is no lawful basis to treat these port usage rights as providing a countervailable benefit because

they were provided by the GOK as repayment of a debt and were not a gift-like transfer of funds.

Hyundai Steel paid to build the port and then was required to revert ownership of the port to the

GOK.  Receiving compensation for this taking of property is not a countervailable benefit to

Hyundai Steel.  Commerce erred in treating it as such and its arguments to the contrary rely on a

distorted view of the program and inapposite cases that do not support its position.

Commerce's finding that Hyundai Steel received a countervailable subsidy from the

sewerage fee program is also unlawful.  The evidence shows that Hyundai Steel paid sewerage

fees based on its actual proven discharge of sewerage into the public sewer system.  This method

of payment is provided for under Korean law and results in companies like Hyundai Steel paying

what they actually owe instead of being overcharged based on the presumption.  This

arrangement does not result in the government foregoing any revenue otherwise due but instead

right sizes what is actually owed and prevents overcharge.  Nor does it provide a benefit because

the record shows that Hyundai Steel paid sewerage fees based on its actual proven discharge.  It

was not better off than it would have otherwise been absent the program.

## V.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in a CVD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.    ARGUMENT

In order to find that a countervailable subsidy exists, Commerce must determine that a government authority has provided (i) a financial contribution, that (ii) confers a benefit that is (iii) specific.  19 U.S.C. § 1677(5)(B), (5A).  This case presents a challenge to Commerce's determinations that (i) Hyundai Steel received a benefit from the GOK's provision of port usage rights at Incheon Harbor, and that (ii) Hyundai Steel received a financial contribution and benefit from the GOK in connection with its payment of sewerage fees.  Although Commerce calculated a relatively small benefit for each "program," these issues are of the utmost importance to Hyundai Steel given that they are the difference between receiving a *de minimis* subsidy margin or one that is just above *de minimis*.  *De minimis* means Hyundai Steel receives refunds of all the countervailing duty cash deposits it paid in calendar year 2018; over *de minimis* means it does not.  *See* 19 C.F.R. § 351.106(c).

### A.    Commerce's Determination That The GOK's Provision Of Port Usage Rights Provides A Countervailable Benefit Is Unsupported By Substantial Evidence And Is Otherwise Contrary To Law.

In the *Final Results*, Commerce found that the port usage rights program provides a financial contribution in the form of revenue foregone because the GOK gave Hyundai Steel the right to collect berthing income and harbor facility usage fees, which otherwise would have been collected by the GOK.  P.R. 176 at 17.  Commerce also found that the program to be specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients were limited in number,

10

and that a benefit existed under section 771(5)(E) of the Act in the amount of the fees exempted that were reported by Hyundai Steel. *Id.* In doing so, Commerce did not find relevant the undisputed fact that the port usage rights and resulting income/fees that Hyundai Steel collected were provided by the GOK as reimbursement for the construction costs incurred by Hyundai Steel in building the port that was required to be reverted to the GOK under Korean law, and that the length of the reimbursement schedule was calibrated to only reimburse Hyundai Steel for its construction costs and nothing more. Hyundai Steel believes that this decision is not supported by substantial evidence and is otherwise not in accordance with law.

### 1. There Is No Evidence That The Port Usage Rights Were Excessive And Thus They Provided No Countervailable Benefit.

Commerce seeks to support its decision to treat the GOK's provision of port usage rights to Hyundai Steel as a countervailable benefit by claiming that this decision is consistent with prior cases where it has addressed the same or similar programs. *See* P.R. 176 at 19-21 and cases cited therein. A close look at these prior cases reveals that they are either inapposite or actually support the conclusion that Hyundai Steel did <u>not</u> receive a countervailable benefit from the GOK's provision of port usage rights to compensate Hyundai Steel for its construction costs.

The first line of cases relied upon by Commerce are Korean cases in which it has examined the provision of port usage rights to support its treatment of Hyundai Steel's rights as a "recurring grant program." *Id.* n.91 (citing *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 64,122 (Dep't Commerce Oct. 9, 2020) and accompanying Issues and Decision Memorandum at Comment 6 ("*HRS from Korea 2017*"); *Notice of Final Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 Fed. Reg. 38,565 (Dep't Commerce July 13, 2007), and

accompanying Issues and Decision Memorandum at 6-7 and Comment 1 ("*CTL Plate from Korea 2005*"); *Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 Fed. Reg. 55,241 (Dep't Commerce Sept. 10, 2013), and accompanying Decision Memorandum at 11 ("*CORE from Korea 2011*"), unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011*, 79 Fed. Reg. 5,378 (Dep't Commerce Jan. 31, 2014); *Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea*, 67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002), and accompanying Issues and Decision Memorandum at 20 and Comment 11 ("*CR from Korea 2000*")).  Commerce also relies on the Federal Circuit's decision in *AK Steel Corporation v. United States*, 192 F.3d 1367, 1382 (Fed. Cir. 1999), which was an appeal of Commerce's decision in *Steel Products from Korea*.  *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea*, 58 Fed. Reg. 37,338, 37,346-48 (Dep't Commerce July 9, 1993) ("*Steel Products from Korea*").

On its face, this appears to be an extensive line of cases where Commerce has addressed the port usage fee program in Korea and found the provision of port usage rights to provide a countervailable benefit.  However, upon closer inspection these cases reveal an evolving standard for analyzing this program that finds a countervailable benefit to exist only if the period of port usage rights provided by the GOK is excessive and thereby leads to excessive reimbursement for construction costs incurred by the Korean respondent.  Commerce fails to acknowledge this "excessive benefit" standard and did not apply it to Hyundai Steel in the *Final Results*.  Had this established "excessive benefit" standard been applied to Hyundai Steel it

would have resulted in a finding of no countervailable benefit from the provision of port usage rights by the GOK. A brief summary of the history of this issue in Korea is necessary to understand how Commerce's practice has evolved.

In *Steel Products from Korea*, Commerce examined the exemption of dockyard fees to POSCO as part of the Kwangyang Bay Industrial Estate ("KBIE") program (not under the Harbor Act). *Steel Products from Korea*, 58 Fed. Reg. at 37,346-48. Under this program, POSCO built fifteen port berths that were reverted to the GOK and received exemptions from dockyard fees from the GOK to compensate POSCO for its construction costs. *Id.* at 37,347-48. Commerce found that these exemptions were countervailable because "POSCO built the berths for its own benefit" and, even if the GOK had built the port berths, Commerce would have countervailed the construction funding as a direct provision of infrastructure. *Id.* This case was appealed to the Federal Circuit who affirmed Commerce's determination that POSCO's dockyard fee exemptions were countervailable. *AK Steel Corporation*, 192 F.3d at 1382.

Several years later, Commerce reviewed the port usage rights program, but this time under the same Harbor Act that governs Hyundai Steel's port usage rights in this case, and found that such port usage rights were <u>not</u> countervailable. Specifically, in *Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils From the Republic of Korea*, 64 Fed. Reg. 30,636, 30,649 (Dep't Commerce June 8, 1999) ("*Stainless Sheet*"), Commerce determined that, by law, ownership of such port facilities must be reverted to the GOK and, by law, the company that builds the facility then "has the right to free usage of that facility and the ability to collect fees from other users of the facility." *Stainless Sheet*, 64 Fed. Reg. at 30,649. Every company that must revert the facility that it built is granted this right and this right only extends until the company "recaptures its cost of constructing the facility." *Id.*

13

Accordingly, Commerce determined that the provision of these port usage rights under the Harbor Act were <u>not</u> countervailable even if a company constructs a harbor facility for its own use. *Id.* ("{U}nder the Harbor Act, any company within any industrial sector is eligible to construct infrastructure *necessary for the operation of its business* provided that it receives approval by the Administrator of the Maritime and Port Authority to build the facility." (emphasis added)). *Id.*

A few years later, Commerce revisited the port usage program in Korea once again. In that case, Commerce acknowledged the different results between the *Steel Products from Korea* (countervailable) and *Stainless Steel Sheet* (not countervailable) cases, and articulated an "excessive benefit" standard for determining whether a benefit exists. Specifically, in *CR from Korea 2000*, Commerce countervailed the port usage fee exemptions Dongbu received because Commerce determined that the "excessive exemption period" of 70 years granted to Dongbu constituted revenue foregone because Dongbu "received more than just a limited exemption on its harbor fee{,} {i}t also received compensation which *lasted longer than the useful life of the constructed assets*." *CR from Korea 2000* at 20 and Comment 11 (emphasis added); *see also* P.R. 176 n.91 (citing *CORE from Korea 2011* at 11 (finding that Dongbu's port usage fee exemptions were countervailable because of the "excessive exemption period of 70 years"). The "excessive benefit" standard was also later applied in *CTL Plate from Korea 2005* at 6-7 and Comment 1, where Commerce determined that Dongkuk Steel Mill Co., Ltd.'s ("DSM") DSM's "free use" period of 50-years "is so long that it effectively renders DSM the owner of the facility" because the "free use" period constituted "a period of time so great" that the GOK's compensation outlasts the useful life of the constructed assets and "effectively renders ownership of the facility to DSM." P.R. 176 n.91.

NON-CONFIDENTIAL

Taken together, these more recent cases stand for the proposition that port usage rights (including exemptions) received for the use of ports constructed by a Korean respondent and reverted to the GOK as required by law, will be treated as providing a countervailable benefit if the reimbursements are excessive based on the length of the exemption period.[1]  Conversely, if the length of the exemption period is not excessive then it follows that the provision of these port usage rights do not provide a countervailable benefit.  Far from supporting Commerce's determination in this case, these cases that Commerce itself cites as support actually demonstrate the error in Commerce's analysis.  Applied to the *Final Results*, these cases would require a finding that Hyundai Steel's port usage rights are *not* countervailable.  Hyundai Steel was granted port usage rights for the facility it constructed at Incheon Harbor for approximately **[**

**]**.  C.R. 51 at 43.  This period is shorter than the IRS AUL period for a port as used in *CTL Plate from Korea 2005*, and the "excessive exemption period" in *CR from Korea 2000*.  Indeed, the length of the port usage rights granted to Hyundai Steel was calibrated specifically to reimburse it for its construction costs and nothing more.  *E.g.*, C.R. 163 at 6-8. Importantly, as the GOK noted, *regardless* of whether Hyundai Steel fully recuperates its costs, Hyundai Steel will no longer possess port usage rights after this period expires, so it will not become excessive in the future.  *Id.* at 1.

In response to this argument, Commerce attempts to blur the lines of its "excessive benefit" standard by claiming that Hyundai Steel's **[                           ]** period is "similar to the extended periods of 50 to 70 years in the above cases, which {Commerce} determine{d} to

---

[1] Commerce also cites to *HRS from Korea 2017* as support for its decision to treat this program as one that provides recurring benefits.  *See* P.R. 176 at 19, n.91.  This case, however, was based in part on facts available and is currently on appeal before this Court.  *See* Ct. No. 20-03799.

be excessive and, thus, provide a benefit." P.R. 176 at 21.  This is not correct.  The 50-70 year periods involved in cases such as *CR from Korea 2000* and *CTL Plate from Korea 2005*, were found to be excessive because they were equal to or exceeded the AUL periods for the assets, and effectively granted ownership to the respondent.  *See CR from Korea 2000* at 49; *CTL Plate from Korea 2005* at 11.  In contrast, Hyundai Steel was granted port usage rights for the facility it constructed at Incheon Harbor for approximately [                                    ]. C.R. 51 at 43. This period is shorter than the AUL period for a port as used in *CTL Plate from Korea 2005*, and the "excessive exemption period" in *CR from Korea 2000*.  As discussed, the length of the port usage rights granted to Hyundai Steel was calibrated specifically to reimburse it for its construction costs and nothing more.  *E.g.*, C.R. 163 at 6-8.

Despite the existence and application of this "excessive benefit" standard in the cases discussed, Commerce failed to analyze Hyundai Steel's port usage rights under its "excessive benefit standard."  No explanation was provided and instead Commerce actually cited to this very same line of cases to support its decision to treat this program as providing a recurring benefit to Hyundai Steel.  *See* P.R. 176 at 19, n.91.  Commerce should have applied this "excessive benefit" standard in the *Final Results*.  *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) (Commerce should follow practice until it "provides a sufficient, reasoned analysis explaining why a change is necessary."); *see also Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("{I}f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").

Commerce also cites to two additional non-Korean cases to try and further support its decision – *SC Paper from Canada* and *Quartz Surface Products from Turkey*.  P.R. 176, n.94-95.

*Supercalendered Paper From Canada: Preliminary Affirmative Countervailing Duty*

*Determination*, 80 Fed. Reg. 45,951 (Dep't Commerce Aug. 3, 2015), and accompanying

Decision Memorandum at 25 ("*SC Paper from Canada*"), unchanged in *Supercalendered Paper*

*From Canada: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535

(Dep't Commerce Oct. 20, 2015), and accompanying Issues and Decision Memorandum at 26

and 28; *Certain Quartz Surface Products From the Republic of Turkey: Preliminary Affirmative*

*Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances*

*Determination, and Alignment of Final Determination With Final Antidumping Duty*

*Determination*, 84 Fed. Reg. 54,841 (Dep't Commerce Oct. 11, 2019), and accompanying

Decision Memorandum at 10–11 ("*Quartz Surface Products from Turkey*"), unchanged in

*Certain Quartz Surface Products From the Republic of Turkey: Final Affirmative Countervailing*

*Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85

Fed. Reg. 25,400 (Dep't Commerce May 1, 2020), and accompanying Decision Memorandum.

These cases are inapposite.

 Under the port usage program, Hyundai Steel receives port usage rights to reimburse it

for the costs of constructing the port that it incurred *because* it cannot retain title to the port after

construction is completed.  *See* C.R. 163 at 1; *see also Stainless Steel Sheet and Strip from*

*Korea*, 64 Fed. Reg. at 30,649 ("Because a company must transfer to the government its

infrastructure investment, the GOK . . . grants the company free usage of the facility and the

right to collect fees from other users of the facility until the company recovers its investment

cost.").  In contrast, in *SC Paper from Canada* and *Quartz Surface Products from Turkey* there is

no indication that any of the grants from the programs at issue were provided as compensation

for constructed assets to which the companies no longer retain title.  Instead, these cases just

involve normal non-recurring grants. This is an important distinction that makes these cases easily distinguishable from the port usage program at issue in this appeal.

Finally, Commerce also relies on the Federal Circuit's ruling in *AK Steel* to support its treatment of the port usage rights program as countervailable. In doing so, however, Commerce completely ignores its own precedents that came *after* the Federal Circuit's decision that render *AK Steel* inapposite and not controlling in this case. As discussed *supra*, the *AK Steel* decision involved a review of Commerce's decision in *Steel Products from Korea*, which was the first case dealing with the port usage fee issue and was not under the Harbor Act that is at issue in this appeal. While the *AK Steel* case was before the Federal Circuit, Commerce was conducting another investigation of POSCO in a separate case – *Stainless Steel Sheet and Strip from Kore*a. As discussed *supra*, in that case Commerce analyzed the port facilities that POSCO had constructed at Kwangyang Bay under the Harbor Act and determined that the provision of these port usage rights under the Harbor Act was not countervailable. *Id.*

Commerce thereafter distinguished its decision to countervail the dockyard fee exemptions in *Certain Steel Products* from its decision not to countervail the port usage rights in *Stainless Steel Sheet and Strip* by developing the "excessive benefit" standard. As discussed, in *CR from Korea 2000* at Comment 11, Commerce recognized its different determinations under the KBIE program in *Certain Steel Products* and under the Harbor Act in *Stainless Steel Sheet and Strip*. In finding that the port fee exemptions received by Dongbu Steel Co., Ltd.'s ("Dongbu") under the Harbor Act were countervailable, despite its decision in *Stainless Steel Sheet and Strip* for POSCO for the same program, Commerce determined that Dongbu's "excessive exemption period" of 70 years made its exemption countervailable because such a long exemption period was specific to Dongbu and was longer than the actual useful life and

18

depreciation period of the assets that Dongbu constructed.  *Id.*  By citing only to *AK Steel* and failing to explain the context of that decision, Commerce leapfrogs years of much more recent practice that specifically examine port usage rights under the Harbor Act using the "excessive benefit" standard.  When the history of this program is examined in its entirety, it becomes clear that *AK Steel* is inapposite and not controlling in this case.

>  **2.  Port Usage Rights Are Received As Repayment Of A Debt And Thus Do Not Provide A Benefit To Hyundai Steel.**

Even if the Department's deviation from its prior "excessive benefit" standard as described above is ignored, there is no basis to find that Hyundai Steel received a countervailable benefit from the port usage rights.  The port usage rights were provided to Hyundai Steel as payment of a debt owed by the GOK for the public taking of a port that Hyundai Steel built at significant cost to the company.  Commerce claims that a benefit was conferred pursuant to 19 C.F.R. § 351.503(b), which reads:  "the Secretary normally will consider a benefit to be conferred where a firm pays less for its inputs (e.g., money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."  P.R. 176 at 21; 19 C.F.R. § 351.503(b)(1).   This court has held that "{t}he touchstone of Section 1677(E), from which this regulation is derived, is that what the company received somehow exceeded what the company paid or should have paid." *Government of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1383 (Ct. Int'l Trade 2018) ("*GOSL*").  In this case, there is no benefit from Hyundai Steel's port usage rights.

Korean law requires that certain infrastructure be under government control, including harbors, wharfs, and related infrastructure.  C.R. 102 at Exhibit SQ1 K-Water-1 (providing Article 15 of the Harbor Act, which states that "ownership of land developed or harbor facilities installed . . . shall vest in the State upon completion of the harbor project").  However, there are

NON-CONFIDENTIAL

tremendous costs in constructing harbors, and thus the GOK allows private entities to shoulder the costs to construct such infrastructure at their own expense through the Harbor Act and the Act on the Private Participation in Infrastructure (also known as the Private Participation in Social Infrastructure Act).[2]  C.R. 164 at Exhibit PPP-1.

In 2001, Hyundai Steel entered into an agreement with the Ministry of Oceans and Fisheries to construct a wharf at North Incheon Harbor.  C.R. 52 at 42.  Under the agreement, the GOK incurred no direct expenses in relation to the construction of the port facility, *id.*, while the construction costs were borne by Hyundai Steel. C.R. 163 at 3-4.  The only GOK contributions during construction of the facility were grants that Hyundai Steel received over the five-year construction period totaling [                    ] KRW, which covered only a fraction of the costs to construct the port.  C.R. 51 at 42.  As additional compensation for its construction costs, and pursuant to Article 15 of the Harbor Act and Article 25 of the Act on the Private Participation in Infrastructure, Hyundai Steel and the GOK agreed to a reimbursement schedule, under which Hyundai Steel acquired the right to operate and use the harbor facility and collect certain fees until its construction costs had been repaid.  *See* C.R. 65-67 at Exhibit G-1, Exhibit G-2.  The parties calculated, based on future fees estimated at the time of the agreement, that it would take [                                                        ], to compensate Hyundai Steel for the construction costs.  *See* C.R. 163 at 7-8.  In other words, Hyundai Steel and the GOK agreed that through providing port usage rights to Hyundai Steel, the GOK would be able to provide just compensation for the harbor facility.

---

[2] In Hyundai Steel's Initial Questionnaire Response, it refers to this act as the "Act on Private Participation in Infrastructure" and provided the relevant provisions in Exhibit I-22.  *See* C.R. 51.

This is similar to the way in which the 5th Amendment of the United States Constitution requires that the government provide just compensation prior to obtaining ownership of private property intended for public use.  U.S. Const. amend. V; *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) ("One of the principal purposes of the Takings Clause is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'") (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Contrary to Commerce's claim that "the record does not demonstrate that the main purpose of building the port was for public good or any governmental functions," P.R. 176 at 20, the record shows that the Incheon Harbor development project that included the building of the port was done "in order to relieve congestion and reduce the concentration of pollution at the existing port facilities of Incheon Harbor."  C.R. 163 at 1.  This demonstrates that the port facility was built at least in part for the public good, namely to relieve congestion and to reduce pollution.  The port usage rights that the GOK provided to Hyundai Steel at the North Incheon Harbor were thus part of Hyundai Steel's just compensation for building the port and reverting the port to the GOK.

Further, the reimbursement period *assumes* that Hyundai Steel would collect certain fees from other entities that used the port and this period is calculated so that it is only as long as necessary for Hyundai Steel to recoup its costs, as estimated at the time of agreement.  *See id.* (describing the formula used to calculate the reimbursement period).  However, Hyundai Steel has not collected certain fees from other entities, and every year that Hyundai Steel does not collect these fees, the less likely it becomes that it will fully recover its costs before the reimbursement period expires.  *See* C.R. 165 at 2-14.  This measured and tailored reimbursement period for only as long as necessary to reimburse Hyundai Steel for its

construction costs does not result in a countervailable benefit.  This court's decision in *GOSL* is instructive.

In *GOSL*, this court found that repayment of a debt is distinct from payments through grants, loans, or equity infusions; the three which "yield a net increase to the recipient's capital base at the time of the infusion, whereas interest-free repayment of a debt does not."  *GOSL,* 308 F. Supp. 3d at 1381.  The court reasoned that in such cases where the respondent is "serving as a payment vehicle for" a government program, the respondent is "effectively providing interest-free loans to {the government}. . . to {the respondent's} detriment, rather than its benefit," within the meaning of 19 U.S.C. § 1677(5).  *Id.* at 1382 (finding repayments to the respondent for the difference between the market price for rubber and the mandated "above market 'guaranteed price'" did not provide a benefit).  The court concluded that the reimbursement program at issue was not properly assessed as a grant under 19 C.F.R. § 351.504 because the reimbursement payments "did not constitute a gift-like transfer, but rather the interest-free repayment of a debt."  *Id.* at 1383.  Thus, the court held that the repayments "satisf{y} neither the statutory definition, nor the regulatory interpretation of what constitutes a benefit," reversing Commerce's determination the repayments were countervailable.  *Id.* at 1384.  The court also noted that Commerce was "not authorize{d}. . . to ignore clear, readily available, and already-verified record evidence that a transfer of funds constituted repayment of a debt."  *Id.* at 1381.

Applied to this case, these principles support the conclusion that the port usage rights granted to Hyundai Steel as repayment for its construction of the port at Incheon Harbor do not provide a countervailable benefit.   As mentioned above, the goal of the Act on the Private Participation in Infrastructure is to allow for the construction of public infrastructure through private investment.  CR 164 at Exhibit PPP-4 ("The purpose of this Act is to contribute to the

development of the national economy, by promoting private investment in the social overhead capital facilities, and thus striving for their positive and efficient expansion and operation.").  As such, under the agreement between the GOK and Hyundai Steel, the GOK incurred no direct expenses in relation to the construction of the port facility, while Hyundai Steel bore the brunt of incurring immense expenses.  C.R. 51 at 42; C.R. 163 at 3.  Since the GOK is required to assume ownership of harbor facilities constructed, Hyundai Steel "serv{ed} as a payment vehicle for" the construction of public infrastructure, *i.e.*, the port facility.  *GOSL*, 308 F. Supp. 3d at 1382.  Viewed in this context, it is plain that unlike a grant, loan, or equity infusion, the provision of port usage rights to Hyundai Steel "satisfies neither the statutory definition, nor the regulatory interpretation of what constitutes a benefit."  *Id.* at 1384.

In the *Final Results*, Commerce attempted to distinguish Hyundai Steel's port usage rights from the repayments issued in *GOSL* by arguing that construction of the port and Hyundai Steel's reimbursements were not "implemented for the purpose of supporting other beneficiaries" and that Hyundai Steel was not "required" to build the port whereas the participants in the program at issue in *GOSL* were required to pay the above-market guaranteed price for natural rubber to benefit small farmers.  P.R. 176 at 22-23.  As discussed, the record shows that the Incheon Harbor development project that included the building of the port was done "in order to relieve congestion and reduce the concentration of pollution at the existing port facilities of Incheon Harbor."  C.R. 163 at 1.  Thus, it was not built just to benefit Hyundai Steel. Additionally, the respondent in *GOSL* was "not *required* to rely on locally-sourced rubber," *GOSL*, 308 F. Supp. 3d at 1379 n.3 (emphasis added), but if it did, it was required to pay the above-market guaranteed price and wait to be reimbursed by the Government of Sri Lanka to its "detriment, rather than its benefit."  Similarly, once Hyundai Steel built the port, it was required

to revert ownership of the port to GOK and wait to be reimbursed.  *Id. at* 1382 (emphasis added).

Commerce's suggestion that "other beneficiaries" of the program must exist and that

participation in the program must be mandatory in order to treat a benefit as a non-

countervailable repayment of a debt twists the holding in *GOSL* to add requirements that were

not the basis for the court's decision.

Even if Hyundai Steel built the port at Incheon Harbor solely for its own use, this fact

alone does not excuse abandoning the excessive benefit analysis that Commerce has established

through its precedents.  In *Stainless Steel Sheet and Strip from Korea*, Commerce explicitly

stated that port usage rights received as a result of the requirements of the Harbor Act are

generally not countervailable even if a company constructs a harbor facility for its own use.  64

Fed. Reg. at 30,649 ("{U}nder the Harbor Act, any company within any industrial sector is

eligible to construct infrastructure *necessary for the operation of its business* provided that it

receives approval by the Administrator of the Maritime and Port Authority to build the facility."

(emphasis added)).  The GOK is relieved of the direct and indirect costs of constructing a port,

which makes the GOK a direct beneficiary of Hyundai Steel's assumption of the costs.  As

Commerce explained in *Stainless Sheet*, the GOK "does not have sufficient funds to construct all

of the infrastructure a company may need to operate its business" and thus the GOK allows

private entities to construct certain types of infrastructure that they are not legally allowed to

own.  *Id.*  The court's decision in *GOSL* made no mention of "other beneficiaries" and

Commerce's attempt to distinguish Hyundai Steel's case from the program at issue in *GOSL* for

want of third party beneficiaries is without basis in the court's actual opinion.

While Commerce claims that there is no difference "between the program at issue and a

program in which a government directly provides funding to a company to build a port for the

company's benefit," P.R. 176 at 20, this is not true.  First, directly providing funding for a company to build a port would completely undermine one of the purposes of this GOK program, which is to "attract private companies to make investments in constructing social infrastructures so as to allow the government to spend its national budget more efficiently."  C.R. 163 at 3. Second, Commerce ignores the financial implications of reversion of ownership to the GOK. Specifically, companies like Hyundai Steel that construct harbor facilities under this program must first incur the cost on their own and then do not get the usual benefit of owning the asset on their books.  The port built by Hyundai Steel has value and Hyundai Steel will never be able to sell that asset in the future for remuneration because it had to revert ownership to the GOK.  This is a significant difference between the GOK providing funds to construct the port directly for Hyundai Steel as opposed to Hyundai Steel building the port, reverting ownership to the GOK, and receiving port usage rights for a discrete period of time to recoup construction costs.

Finally, Commerce mischaracterizes Hyundai Steel's argument as one requesting an "offset" to the cost of constructing the port in its benefit analysis.  P.R. 176 at 21-22.   This is a strawman.   Nowhere on the record did Hyundai Steel ever cite to section 771(6) of the Act, 19 U.S.C. § 1671(6), or argue that the amount it invested in building the Incheon North Harbor port should be treated as a statutory "offset" to the port usage rights it received from the GOK as compensation for building the port.  The argument that Hyundai Steel in fact made was that Commerce should apply its "excessive benefit" standard discussed above and only treat the port usage rights program as providing a countervailable benefit if the reimbursement schedule resulted in excessive reimbursement.  *See* C.R. 191 at 2-8.   This is not the same or even analogous to a statutory offset argument.

Accordingly, this Court should find that Commerce's determination that Hyundai Steel's port usage rights confer a countervailable benefit is not supported by substantial evidence and is otherwise not in accordance with law.

**B.      Commerce's Determination That Hyundai Steel's Sewerage Usage Fees Are Countervailable Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law.**

In the *Final Results*, Commerce relied heavily on its determination in *CTL Plate from Korea 2018* for the explanation as to why it found that Hyundai Steel received a financial contribution and benefit from the GOK in connection with its payment of sewerage fees.  P.R. 176 at 26 (quoting *CTL Plate from Korea 2018* at Comment 6).  Specifically, Commerce rejected Hyundai Steel's and the GOK's explanations of Korean law and the basis on which Hyundai Steel paid its sewerage fees (*i.e.*, based on actual proven usage).  Instead, Commerce relied on its own interpretation of Korean law to find that Hyundai Steel's reductions were outside the law and exceeded other rate adjustments for other situations.  This was error, as Commerce has subsequently recognized in later cases where it has reversed its position on this issue and has found that Hyundai Steel's sewerage fees are not, in fact, countervailable.  *See Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, 2019*, 86 Fed. Reg. 55,572 (Dep't Commerce Oct. 6, 2021), and accompanying Post-Preliminary Decision Memorandum ("*CR from Korea 2019*"); *Certain Cut-To-Length Carbon-Quality Steel Plate From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 34,718 (Dep't Commerce June 30, 2021), and accompanying Post-Preliminary Decision Memorandum at 15–19 ("*CTL Plate from Korea 2019*").

In light of these subsequent cases, it is Hyundai Steel's understanding that Defendant plans to request a voluntary remand in the instant appeal.  The Court should grant the voluntary

26

remand if requested.  However, if Defendant does not request a voluntary remand, or does and the Court does not grant it, then Hyundai Steel believes that sufficient evidence exists in the record on appeal for this Court to come to the same conclusion that Commerce reached in *CTL Plate from Korea 2019* and *CR from Korea 2019*.

       **1.**       **Hyundai Steel's Payment of Sewerage Fees Was Fully In Accordance With Korean Law And Thus Commerce's Finding To The Contrary Is Not Supported By Substantial Evidence.**

           **a.**       **Hyundai Steel's Sewerage Fees Were Calculated Pursuant To Korean Law.**

Korean law governs the payment of sewerage fees.  Article 36(2) of the Presidential Decree "stipulates that the service fee for the public sewerage system usages must be calculated on the basis of the amount and type of the sewerage water drained down the system." C.R. 10 at 133.  Thus, Korean law, at the national level, requires that sewerage usage fees be calculated based on users' actual usage of the public sewerage system.  *Id.* at 137.  This is the main principle that governs the sewerage fee charges, and it is logical and equitable as it charges users based on the burden it places on the public system—*i.e.*, the volume of water that needs purification treatment.

Article 65 of the Sewerage Act and Article 36 of the Enforcement Decree of the Sewerage Act delegate responsibility to calculate and collect sewerage fees to the regional governments that operate the public sewerage systems.  *Id.*; C.R. 19 at SEWER-1.  The regional governments therefore issue local regulations to administer the national law.  C.R. 10 at 139-142, C.R. 19 at Exhibit SEWER-1.  However, the regional authorities face a practical problem when assessing fees to users of the public sewerage system.  As the GOK explained, most users normally do not have meters to gauge the actual volume of sewerage water they introduce into the public system, but instead are only able to measure the volume of clean water they consume

27

from the public water supply.  C.R. 10 at 136.  To overcome this practical problem, regional authorities adopted a rebuttal presumption that users' input (clean water that can be measured) is equal to their output (wastewater that cannot be measured in most cases).  In Hyundai Steel's case, Incheon Metropolitan City issued Article 14(1) of the Ordinance adopting this default presumption.  *See* C.R. 19 at Exhibit SEWER-1.

For most users, this input-output presumption is a reasonable proxy for the actual volume of sewerage introduced into the public system (*i.e.*, most of the water from the faucet ends up in the drain).  However, for Hyundai Steel, this presumption results in a significant overcharge in its sewerage usage fees.  This is because Hyundai Steel uses a "significant amount of water for cooling machineries and merchandise" that operate at high temperatures, and thus a significant volume of water "used for such purpose is vaporized in the cooling process."  C.R. 51 at 57.  Thus, the presumption that Hyundai Steel's clean water volume is equal to the volume of wastewater it introduces into the public system overstates the volume of wastewater it actually introduces.

To prevent this type of overcharge, Incheon Metropolitan City issued Article 21 of the Ordinance, which allows for reductions and exemptions in users' sewerage fees.  C.R. 19 at SEWER-1.  These reductions can be provided in various situations, such as for persons in disaster declaration areas or persons that install recirculation equipment.  *Id.*  The Ordinance also includes a "catch-all" provision (Article 21(1)(7)) that states that a reduction of sewerage fees may be granted to "{a} person {for whom} the Management Authority determines that there {is a} public interest or special reason{}."  C.R. 19 at Exhibit SEWER-1.  Recalculating the sewerage fee based on the proven usage volume instead of the clean water consumption volume because the former is lower than the latter (*i.e.*, rebutting the Incheon Metropolitan City's

presumption), is considered in the "public interest" or as a "special condition" for the purpose of this article.  *See* C.R. 10 at 139.

The last piece of the regulatory puzzle is found in Article 9 of the Enforcement Regulation of the Ordinance, which requires that upon receipt of an application under Article 21, the regional government "shall conduct a factual investigation" of the basis of the application— *i.e.*, verify it.  C.R. 19 at Exhibit SEWER-1.

Consistent with this legal framework, Hyundai Steel reported that it received reductions in its sewerage fees at its Incheon Plant pursuant to Article 21(7) of the Ordinance.  C.R. 51 at 56 (emphasis added).  Hyundai Steel's qualification for the payment of sewerage fees based on actual discharge was confirmed by the GOK, which cited to the very same legal provisions, including Article 21(1)(7) of the Ordinance.  C.R. 10 at 137.  The GOK also confirmed that Hyundai Steel qualified for such reductions based on showing that the volume of wastewater it processes through the public sewerage system is much less than the volume of water it uses from the public water supply system.  *Id.*

As per the legal framework, Hyundai Steel submitted an application and supporting documents that demonstrated that its actual sewerage discharge was much lower than the amount of clean water consumed.  *See* C.R. 19 at SEWER-4; *see also* C.R. 69 at Exhibit G-22, Exhibit G-24.  To do so, Hyundai Steel hired, at its own expense, [

] to measure the volume of water Hyundai Steel actually introduced into the public system.  [                              ] studied Hyundai Steel's Incheon facility, measuring the actual water usage, production performance, and water discharge volume.  *See* C.R. 10 at 141; C.R. 19 at SEWER-4; C.R. 69 at Exhibit G-24. Based on its analysis, [                              ] determined that, due to Hyundai Steel's [

29

], Hyundai Steel discharged a much lower sewerage volume than the clean water volume it consumed.  *E.g.*, C.R. 19 at SEWER-4; *see also* C.R. 191 at 21. Specifically, [                              ] found that Hyundai Steel's actual volume of wastewater introduced into the public system was [        ] percent *less* than the volume of clean water it consumed.  C.R. 19 at SEWER-4.  In other words, based on the Incheon Metropolitan City's presumption in Article 14 of the Ordinance, Hyundai Steel was being *overcharged* in its sewerage fees by [        ] percent.

To remedy this overcharge, Hyundai Steel submitted [                                        ], along with its application under Article 21(1)(7) of the Ordinance, to the regional authority.  C.R. 69 at Exhibit G-24.  The purpose was to demonstrate (i) that Hyundai Steel is able to measure the volume of sewerage it introduces into the public system, and (ii) that its actual sewerage discharge is much less than its clean water consumption volume.  *Id.*  Hyundai Steel's application was approved by the regional authority, with notice that Hyundai Steel would be liable if any discrepancies were found between its application and report and future verifications conducted by city officials.  C.R. 19 at SEWER-4; C.R. 69 at Exhibit G-22.  Hyundai Steel was then billed for its sewerage usage based on the proven volume of wastewater it introduced into the public system.  *See* C.R. 19 at SEWER-2; C.R. 69 at Exhibit G-25; C.R. 191 at 21 (demonstrating how Hyundai Steel's sewerage fee was directly proportional to its volume of wastewater on the sample water bill provided by the GOK).

As the facts above make plain, Hyundai Steel qualified under Article 21(1)(7) of the Ordinance and Article 9 of the Enforcement Regulation to pay its sewerage fees based on actual usage.  The facts also demonstrate that Hyundai Steel in fact paid the entirety of the sewerage usage fees that were due based on its demonstrated usage of the public water system.  C.R. 10 at

137; C.R. 19 at SEWER-4; C.R. 69 at Exhibit G-22, Exhibit G-23 at 5, Exhibit G-24; C.R. 191 at 22. Hyundai Steel and the GOK both stated that Hyundai Steel did not receive any discounts, nor are there any discounts reported in Hyundai Steel's water bill. *Id.* This payment based on actual usage was consistent with the governing national law, Article 36(2) of the Presidential Decree, which "stipulates that the service fee for the public sewerage system usages must be calculated on the basis of the amount and type of the sewage water drained down the system." C.R. 10 at 133.

> **b.** **Commerce's Conclusion That Korean Law Did Not Provide For Hyundai Steel's Sewerage Fee Reductions Is Not Supported By Substantial Evidence And Is Contrary To Law.**

Despite this detailed and consistent record evidence from Hyundai Steel and the GOK regarding the legal basis for Hyundai Steel's reductions in sewerage fees, Commerce disregarded these record facts and essentially said "we do not believe you." Specifically, Commerce found that "Article 21, or any other legal provisions cited by the GOK, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged." P.R. 176 at 26 (quoting *CTL Plate from Korea 2018* at Comment 6). No analysis or discussion is provided about Article 21(1)(7) to explain why Commerce found that this catch-all provision did not apply to Hyundai Steel's situation. Instead, Commerce simply asserts that "Hyundai Steel did not qualify for a reduction in its sewage fee" under Korean law because the laws "do not explicitly provide" that entities may receive the type of treatment that Hyundai Steel did. *Id.* (quoting *CTL Plate from Korea 2018* at Comment 6). This conclusion relies entirely on "mere assumptions, which find no apparent support in record evidence" and in fact contradict certified statements made by Hyundai Steel and the GOK. *Jinan Yipin Corp. v. United States*, 31 CIT 1901, 1933-34, 526 F. Supp. 2d 1347, 1375–76 (2007).

Commerce's assumptions are refuted by the very application and approval documents that Hyundai Steel submitted, which both explicitly cite Article 21 of the Ordinance as the basis for the reduction in Hyundai Steel's sewerage fees.  C.R. 19 at Exhibit SEWER-1; C.R. 69 at Exhibit G-22, Exhibit G-24.  Commerce's assumptions are also directly contradicted by both the GOK's and Hyundai Steel's responses that confirm that Hyundai Steel qualified for these sewerage reductions under Article 21(1)(7) of the Ordinance.  C.R. 10 at 137; C.R. 51 at 56.  Instead of weighing this evidence in light of what both Hyundai Steel and the GOK reported, Commerce "ignore{d} the evidence on one side of the scale," relying on its own assumptions regarding the sewerage system in Korea.  *Commc'ns Workers of Am. Loc. 4123 v. U.S. Sec'y of Labor*, 518 F. Supp. 3d 1342, 1352 (Ct. Int'l Trade 2021).  Commerce's determination was based on its own "conjecture or supposition," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013), instead of "information requested from interested parties that: (1) is on the record; (2) was filed within the applicable deadlines; and (3) can be verified," as is required under the statute, Uruguay Round Agreements Act, Statement of Administrative Action, H.R. REP. NO. 103–316, vol. 1, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.  This is not substantial evidence and does not support Commerce's decision.

### 2.    The Amount Of The Sewerage Fee Reductions Received By Hyundai Steel Is Consistent With Korean Law.

The second basis for Commerce's rejection of the GOK's and Hyundai Steel's position that Hyundai Steel qualified for the sewerage fee exemptions under Article 21(1)(7) is that "the amount of the fee reduction that Hyundai Steel received on its overall water bill significantly exceeds the rate adjustments that are specified in the ordinance, with the exception of certain special conditions, such as being located in a disaster area."  P.R. 176 at 26.  However, the "rate adjustments" against which Commerce compares Hyundai Steel's fees are completely irrelevant

to Hyundai Steel's fees, and there is no evidence to support that Hyundai Steel's reductions exceeded those provided for under Korean law.  In fact, Hyundai Steel's sewerage fee reductions were fully consistent with Korean law that seeks to charge fees based on actual usage of the public sewer system.

The factual basis for Commerce conclusion appears to be Appendix 4 of Article 21 of the Ordinance, which list "Adjustment Rate{s}" for sewerage fees and the conditions that must be met in order to receive them.  C.R. 19 at Exhibit SEWER-1.  This Appendix lists various set percentage reductions for certain scenarios, such as persons declared to be in disaster areas, or persons who install and use gray water systems, or persons who receive recycled water from public sewerage facilities.  *Id.*  The percentage reductions for these scenarios range from 20 percent to 100 percent.  *Id.*  Commerce appears to be saying that since Hyundai Steel's reduction was higher than the 20 percent reduction that applied to persons who installed gray water systems or who received recycled water, it must not have been provided under Article 21 of the Ordinance.  Not only is this flawed reasoning, but it also ignores other provisions that undercut this logic.

First, and most importantly, Article 21 of the Ordinance is clear that *none* of these rates or criteria in Appendix 4 even apply to Article 21(1)(7) of the Ordinance.  Specifically, Article 21(2) states that "{t}he reduction and exemption standards for *subparagraphs 1 through 6* of Paragraph 1 shall be set forth in Appendix 4."  *Id.* (emphasis added).  As both the GOK and Hyundai Steel have reported, Hyundai Steel's sewerage fees were recalculated based on Article 21(1)(7), which is <u>not</u> governed by the rates set forth in Appendix 4.  *See* C.R. 10 at 137; C.R. 51 at 56.  There is thus no basis to conclude that Hyundai Steel's reduction rates should be consistent with those listed in Appendix 4.

Second, even if Appendix 4 did apply there is no reason to think that the percentage reduction in sewerage fees for a customer like Hyundai Steel, which is paying fees based on actual proven usage, should be in parity with the set percentages listed in Appendix 4. These set percentages apply to persons that are not actually measuring their usage, and thus there is no reason to expect them to mirror the reductions for customers that do measure usage.

Finally, it is not even true that Hyundai Steel's reduction significantly exceeds those in Appendix 4. There are two scenarios listed in Appendix 4 that result in 100 percent reductions in sewerage fees, and two that result in 20 percent reductions. C.R. 19 at Exhibit SEWER-1. Hyundai Steel's reduction based on actual usage was [      ] percent. *See Id.* at Exhibit SEWER-4. This falls between these two listed ranges and is in fact lower than two of the listed scenarios, and undermines Commerce's conclusion that Hyundai Steel's reduction "significantly exceeds" the reductions in Appendix 4.

In sum, Commerce's basis for finding that Hyundai Steel did not qualify for sewerage fee reductions under Korean law is not supported by substantial evidence. Furthermore, as discussed below, the method of payment of sewerage fees used by Hyundai Steel does not result in any financial contribution or benefit. Commerce's determination that Hyundai Steel received a counervailable subsidy thus cannot stand.

### 3. Hyundai Steel Did Not Receive A Countervailable Subsidy In Connection With Its Payment Of Sewerage Usage Fees.

In the *Final Results*, Commerce found "that the reduction in Hyundai Steel's sewerage fee under the program constitutes revenue foregone, and that a benefit was conferred, in accordance with sections 771(5)(D)(ii) and 771(5)(E) of the Act, respectively." P.R. 176 at 27. No other analysis or explanation was provided, aside from Commerce's finding that Hyundai Steel's sewerage fee reductions were not provided for under Korean law and significantly

exceeded the rate adjustments specified in Appendix 4 to Article 21 of the Ordinance.  As

discussed below, the record shows that there was no financial contribution and no benefit

provided to Hyundai Steel.

> **a.      Hyundai Steel Received No Financial Contribution Because
> The Government Of Korea Did Not Forego Any Revenue
> Otherwise Due.**

In the *Final Results*, Commerce found that the reduction in sewerage fees resulted in a

financial contribution from the GOK to Hyundai Steel in the form of revenue forgone, as

described in section 771(5)(D)(ii) of the Act.  *Id.*  This finding is in error because the record

shows that, in accordance with Korean law, Hyundai Steel paid exactly what it should have paid

based on its actual discharge of sewerage into the public sewer system.  There was thus no

revenue foregone by the GOK that was otherwise due.

Section 1677(5)(D)(ii) provides that the term "financial contribution" means –

> (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits
> or deductions from taxable income . . . .

19 U.S.C. §1677(5)(D).  Although what constitutes revenue foregone is not specifically defined,

§ 1677(5)(D)(ii) connotes that the revenue that is foregone must be "otherwise due."

In the *Final Results*, it appears that Commerce found that the GOK was foregoing the

additional revenue it would have "otherwise {been} due" absent the reduction in sewerage fees.

That is, the GOK was foregoing the revenue that would have otherwise been due using the

rebuttable presumption that the amount of clean water consumed equals the amount of sewerage

discharged.  However, a careful examination of the operation of this program in its entirety

reveals that there was no revenue foregone that was otherwise due because Hyundai Steel paid

the entirety of the sewerage fees that were due based on its actual demonstrated usage of the

35

public water system.  C.R. 10 at 137; C.R. 19 at SEWER-4; C.R. 69 at Exhibit G-22, Exhibit G-23 at 5, Exhibit G-24; C.R. 191 at 22.

    As previously discussed, Hyundai Steel applied for and was approved to pay its sewerage usage fees based on its actual proven discharge of sewerage into the public sewer system under Article 21(1)(7) of the Ordinance.  C.R. 19 at SEWER-4; C.R. 69 at Exhibit G-22, Exhibit G-24. The actual discharged amount was based on a study performed by an independent third party and was subject to verification.  C.R. 10 at 141; C.R. 51 at Exhibit G-23, Exhibit G-24.  Hyundai Steel and the GOK both reported that Hyundai Steel did not receive any discounts, nor are there any discounts reported in Hyundai Steel's water bill.  C.R. 10 at 137; C.R. 51 at 57.  There is thus no evidence that Hyundai Steel received any reduction in excess of its actual usage, and in fact the evidence shows that Hyundai Steel paid exactly what it owed based on its proven usage. The GOK thus was paid exactly what it was owed and did not forego any revenue that was "otherwise due."

    This payment method was consistent with Article 36(2) of the Presidential Decree that establishes the principle that sewerage fees should be based on actual usage.  C.R. 19 at SEWER-1.  Indeed, had Hyundai Steel paid sewerage fees based on the rebuttable presumption that the amount of clean water consumed was equal to sewerage discharged, it would have overpaid and the GOK would have received extra revenue that was not "otherwise due." Specifically, the Incheon Metropolitan City's default basis for calculating sewerage fees (Article 14(1) of the Ordinance) resulted in an overcharge to Hyundai Steel that was inconsistent with the national law (Article 36(2) of the Presidential Decree).  Correcting an overcharge of fees is not "foregoing or not collecting revenue that is otherwise due," and applying § 1677(5)(D)(ii) in this case would render the term "otherwise due" void of any meaning.  *Corley v. United States*, 556

36

U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotations omitted)).

Lastly, as this court stated in *GOSL*, it is inconsistent with the statute to "selectively analyz{e} the {reduction} in isolation from the overall . . . program." *GOSL,* 308 F. Supp. 3d at 1380.  This is to say that Commerce cannot simply analyze the "reduction" in Hyundai Steel's overall sewerage fees without also considering what the Incheon Metropolitan City is "otherwise due" under the national law, and what Hyundai Steel would have paid under the City's rebuttable presumption.  As explained above, the facts make clear that (i) the Incheon Metropolitan City is due fees based on actual usage of the public sewer system under the national law, and that (ii) Hyundai Steel would have been overcharged under the Incheon Metropolitan City's rebuttable presumption.  Thus, when Hyundai Steel's sewerage usage fees are analyzed in their entirety under the Korean statutory and regulatory scheme, there is no basis to find that the GOK provided a financial contribution to Hyundai Steel.

> **b.      Hyundai Steel Did Not Receive A Countervailable Benefit Because The Sewerage Usage Fees Were Directly Proportional To Its Usage Of The Public Sewerage System.**

In the *Final Results*, Commerce also determined that Hyundai Steel received a countervailable benefit under 19 U.S.C. § 1677(5)(E) from the reduction in the amount of sewerage fees it paid.  P.R. 176 at 27.  This determination is unsupported by substantial evidence and is otherwise not in accordance with law because the sewerage fees paid by Hyundai Steel were directly proportional to its usage of the sewerage system.

The statute provides examples of when a benefit is normally conferred for equity infusions, loans, loan guarantees, and when goods or services are provided by a government authority.  19 U.S.C. § 1677(5)(E).  However, the statute does not specifically address a

program, such as sewerage fee reductions.  To fill this gap, Commerce's regulations provide a

"catch-all" provision for the benefit conferred from other types of potential subsidies.  *See* 19

C.F.R. § 351.503(b)(1).  The "touchstone" of the relevant statutory provision "is that what the

company received somehow exceeded what the company paid or should have paid." *GOSL*, 308

F. Supp. 3d at 1383.

Here, it is clear that the sewerage fees paid by Hyundai Steel were exactly what it should

have paid, and thus Hyundai Steel received no benefit.  As discussed, Hyundai Steel rebutted the

presumption that the amount of clean water it consumed is equivalent to the volume of

wastewater it discharged into the sewerage system.  This was done in accordance with Article

21(1)(7) of the Ordinance.  *See* C.R. 19 at SEWER-1.  Therefore, Hyundai Steel paid its

sewerage fees based on the actual proven volume of sewerage it discharged.  *See* C.R. 191 at 22

(demonstrating how Hyundai Steel's sewerage fee was directly proportional to its volume of

wastewater on the sample water bill provided by the GOK).  This does not constitute a

countervailable benefit under Commerce's own formulation of the standard.  *See Countervailing*

*Duties*, 63 Fed. Reg. 65,348, 65,630 (Dep't Commerce Nov. 25, 1998) (explaining that "in an

overwhelming majority of cases, the recipient . . . enjoys a reduction in input costs or revenue

enhancement that it would not otherwise have enjoyed absent the government action").

Commerce reached a contrary result only by ignoring the entire structure of the Korean

sewerage system and focusing solely on the reduction of Hyundai Steel's fees.  *See* P.R. 176 at

27.  That is, Commerce just compared what Hyundai Steel would have paid based on the

rebuttable presumption to what it paid based on actual proven usage and treated the difference as

a benefit.  However, in "selectively analyz{e} the {reduction} in isolation from the

overall . . . program," Commerce missed the forest for the trees and committed an error.  *GOSL*,

308 F. Supp. 3d at 1380.  The reduction of Hyundai Steel's sewerage fees cannot be viewed in isolation, and must be examined in light of the significant overcharge it initially incurred under the Incheon Metropolitan City's rebuttable presumption of Article 14(1) of the Ordinance.

When viewed in this light, it is clear that Hyundai Steel's "reduction" is no reduction at all, as it fully paid its sewerage usage fees as required under the national law.  Hyundai Steel is thus not paying less than it should have paid.  Instead, it is paying exactly what it should have paid.  The payment of sewerage fees thus did not provide Hyundai Steel with a countervailable benefit under 19 U.S.C. § 1677(5)(E).  *See id.* at 1383.  Commerce's conclusion that Hyundai Steel received a countervailable benefit thus cannot stand.

## VII.    <u>CONCLUSION AND RELIEF REQUESTED</u>

Based on the foregoing, Hyundai Steel respectfully requests that this Court (i) hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Hyundai Steel Company*

39

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 12,336 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills