C-580-884
Remand
Slip Op. 23-15
POR:  01/01/2018 – 12/31/2018
**Public Document**
E&C/OV:  Team

*Hyundai Steel Company v. United States,*
**Court No. 21-00536, Slip Op. 21-15 (CIT February 10, 2023)**
**Certain Hot-Rolled Steel Flat Products from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (CIT) issued on February 10, 2023.[1]  These final results of redetermination concern

Commerce's final results in the administrative review of the countervailing duty (CVD) order on

certain hot-rolled steel flat products from the Republic of Korea (Korea) covering the period of

review (POR) January 1, 2018, through December 31, 2018.[2]  At Commerce's request, the CIT

remanded to Commerce its determination to countervail the Reduction for Sewerage Fees

program.  Additionally, the CIT remanded Commerce's benefit determination relating to the

Provision of Port Usage Rights at the Port of Incheon program.

As set forth below, Commerce has reexamined its financial contribution analysis for the

Reduction for Sewerage Fees program and has determined that the program is not

countervailable.  Additionally, Commerce has provided further explanation regarding its

---

[1] *See Hyundai Steel Company v. United States*, Court No. 21-00536, Slip Op. 23-15 (CIT February 10, 2023) (*Remand Order*).
[2] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2018*, 86 FR 47621 (August 26, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

treatment of the Provision of Port Usage Rights at the Port of Incheon program and, in particular, its benefit determination.  Commerce's subsidy rate calculation for this program is unchanged. Consequently, for these final results of redetermination, Commerce has revised the overall subsidy rate calculated for Hyundai Steel Company (Hyundai Steel) to be 0.50 percent *ad valorem*.

## II.    BACKGROUND

On December 11, 2019, Commerce initiated a CVD administrative review concerning imports of certain hot-rolled steel flat products from Korea during the period January 1, 2018, through December 31, 2018.[3]  On February 11, 2020, Commerce selected Hyundai Steel as a mandatory respondent in the administrative review.[4]  In the *Preliminary Results*, Commerce determined that Hyundai Steel received countervailable subsidies from the Government of Korea (GOK) under various programs, including the Reduction for Sewerage Fees program and the Provision of Port Usage Rights at the Port of Incheon program.[5]  In the *Final Results*, Commerce continued to countervail both programs.[6]

With respect to the Reduction for Sewerage Fees program, we found that Hyundai Steel received a financial contribution because its reduced sewerage bill reflected revenue forgone within the meaning of section 771(5)(D)(ii) of the Tariff Act of 1930, as amended (the Act), was specific within the meaning of section 771(5A) of the Act, and conferred a benefit within the

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 67717 (December 11, 2019); *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 3014 (January 17, 2020) (correcting the formatting for two company names included in the December 11, 2019 notice).
[4] *See* Memorandum, "Respondent Selection," dated February 11, 2020.
[5] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 86 FR 10533 (February 22, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 14-18.
[6] *See Final Results* IDM at Comments 2 and 3.

meaning of section 771(5)(E) of the Act.[7]  Commerce calculated a 0.01 percent *ad valorem* subsidy rate for the program.[8]

With respect to the Provision of Port Usage Rights at the Port of Incheon program, we found that Hyundai Steel received a financial contribution in the form of revenue forgone, because the GOK gave Hyundai Steel the right to collect berthing income and harbor facility usage fees which otherwise would have been collected by the GOK.[9]  We found the program to be specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients were limited in number, and we determined that a benefit existed under section 771(5)(E) of the Act in the amount of the fees that Hyundai Steel was entitled to collect.[10]  For the *Final Results*, Commerce calculated a 0.01 percent *ad valorem* subsidy rate for the program.[11]

Hyundai Steel filed suit at the CIT challenging Commerce's findings regarding the countervailability of the Reduction for Sewerage Fees program and the Provision of Port Usage Rights at the Port of Incheon program.  Commerce requested a voluntary remand regarding the Reduction for Sewerage Fees program.  On February 10, 2023, the CIT issued its *Remand Order*, granting Commerce's request for a voluntary remand to reconsider our affirmative countervailability finding for the Reduction for Sewerage Fees program.[12]

The CIT also remanded Commerce's benefit determination relating to the Provision of Port Usage Rights at the Port of Incheon program.  Specifically, the CIT found that Commerce failed to consider information "regarding adequate remuneration for port usage in relation to the prevailing market conditions, such as price, quality, availability, marketability, transportation,

---

[7] *See Preliminary Results* PDM at 14-16, unchanged in *Final Results* IDM at Comment 3.
[8] *See Final Results* IDM at 7.
[9] *Id.* at Comment 2.
[10] *Id.*
[11] *Id.* at 7.
[12] *See Remand Order* at 11-12.

and *other conditions of purchase or sale*" and failed to provide "an analysis of the record evidence to determine that the Government of Korea provided usage of the port for less than adequate remuneration."[13]  As a result, the CIT found Commerce's determination that the Provision of Port Usage Rights at the Port of Incheon constituted a benefit was not supported by substantial evidence.[14]

During the course of this remand segment, Commerce reopened the administrative record to place public information on the record.[15]  Commerce also issued a supplemental questionnaire to the GOK regarding the Reduction for Sewerage Fees program because we did not collect certain information during the underlying review.[16]  The GOK timely responded to Commerce's supplemental questionnaire.[17]

Commerce released the Draft Results on March 16, 2023, finding that the Reduction for Sewerage Fees program is not countervailable and providing additional explanation as to why the Provision of Port Usage Rights at the Port of Incheon program confers a benefit.[18]  Nucor Corporation (Nucor) and Hyundai Steel submitted comments on the Draft Results on March 23, 2023.[19]

---

[13] *Id.* at 10 (internal citations omitted, emphasis in original).
[14] *Id.*
[15] *See* Memorandum, "Placement of New Factual Information on the Record," dated March 2, 2023 (NFI Memorandum).
[16] *See* Commerce's Letter, "Supplemental Questionnaire," dated March 2, 2023.
[17] *See* GOK's Letter, "Response to the Supplemental Questionnaire," dated March 8, 2023 (GOK March 8, 2023 SQR).
[18] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 21-00536, Slip Op. 23-15 (CIT February 10, 2023), dated March 16, 2023 (Draft Results).
[19] *See* Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated March 23, 2023 (Nucor Comments); and Hyundai Steel's Letter, "Hyundai Steel's Comments on Draft Remand Redetermination," dated March 23, 2023 (Hyundai Steel Comments).

### III.   ANALYSIS

#### A.  Reduction for Sewerage Fees

Based on the record evidence and our understanding of the program at the time of the *Final Results*, Commerce found the Reduction for Sewerage Fees program to be countervailable.[20]  However, after gaining an increased understanding of how companies could receive a reduction in sewerage fees pursuant to this program, Commerce found the program to not be countervailable in the subsequent administrative review of this order, covering the period January 1, 2019, through December 31, 2019.[21]  For the purposes of these final results of redetermination, we reconsidered the record evidence in the 2018 administrative review, along with the information provided in the GOK's supplemental questionnaire response, and find that the program is not countervailable.

There are both federal and municipal level laws and regulations governing this program. At the federal level, the legal basis for the collection of sewerage fees is found under Article 65(1) of the Sewerage Act and Article 36(2) of the Enforcement Decree of the Sewerage Act.[22] Article 65(1) of the Sewerage Act stipulates that regional or local governments shall set how usage fees are calculated in their ordinances.[23]  Article 36(2) of the Enforcement Decree of the Sewerage Act states:

> When the public sewerage management authority determines the amount of the usage fee pursuant to Article 65(1) of the Act, it shall do so based upon the

---

[20] *See Final Results* IDM at Comment 3.

[21] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 27570 (May 9, 2022), and accompanying IDM at Comment 6 ("In our Post-Preliminary Analysis Memorandum, we determined that the program for the reduction in sewerage usage fees in the city of Incheon was not countervailable. … After reviewing the information on the record, and consistent with previous determinations in other proceedings, we agree with the GOK that the reduction of sewerage usage fees in Pohang is, likewise {*i.e.*, consistent with our treatment of the Incheon sewerage program}, not countervailable.").

[22] *See* GOK's Letter, "Response to the Countervailing Duty Initial Questionnaire," dated March 30, 2020 (GOK March 30, 2020 IQR), at 138.

[23] *Id.*

amount of sewage that relevant users send down through the public sewerage system and the quality and usage pattern of the sewage within the aggregate amount of the maintenance expense for the relevant public sewerage system, depreciation costs, interest on borrowings for relevant facilities, and other expenses that incur to continue the business.[24]

At the municipal level, Articles 12, 14, and 21 of the Incheon Metropolitan City Ordinance on Sewerage System Use stipulate the method for calculating the sewerage fee and any reductions or exemptions to be used in calculating the applicable usage fee.[25]  Article 9 of the Enforcement Regulation on the Incheon Metropolitan City Ordinance on Sewerage System Use identifies the process by which companies apply for a reduction to their sewerage fees.[26]  To qualify for this program in Incheon, companies or households must submit an application to their local government authority.[27]

Article 14(1) of the Incheon Metropolitan City Ordinance on Sewerage System Use states that fees for sewage disposed will be calculated based on the amount of water supplied to the user.[28]  The GOK explained that this calculation methodology is used because users "normally do not have gauging meters installed for measuring the amount of sewage water that they have sent down through the public sewerage system, but only have gauging meters installed for measuring the supply of clean water that they receive from the public water supply system."[29]

Hyundai Steel reported that it received a reduction of its sewerage fees in Incheon under Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewerage System Use, which required submission of an application for a reduction pursuant to Article 9 of the enforcement

---

[24] *Id.*

[25] *Id.* at 139; and GOK's Letter, "The Republic of Korea's Response to the Countervailing Duty First Supplemental Questionnaire," dated July 16, 2020 (GOK July 16, 2020 SQR), at Exhibit SEWER-1 (Revised).

[26] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).

[27] *Id*.

[28] *Id.*

[29] *See* GOK March 30, 2020 IQR at 133.

decree regulation of the same ordinance, as referenced above.[30]  Hyundai Steel's application was accompanied by a report that determined that Hyundai Steel's volume of discharge into the sewerage system was less than the volume of water supplied to Hyundai Steel.[31]  Specifically, this report ascertained the difference between the volume of wastewater ultimately sent through the sewerage system and the total volume of water consumed by Hyundai Steel,[32] *i.e.*, to account for water that is vaporized during Hyundai Steel's production process and, thus, is not discharged into the sewerage system.[33]

In the *Final Results*, we stated, "the legal provision relating to the Incheon Metropolitan City Ordinance on Sewerage System {Use}, does not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged."[34] However, upon further consideration, we now find that both federal and municipal laws and regulations state that sewerage fees shall be based on the volume of sewage discharged into the public sewerage system.

As detailed above, at the federal level, Article 36(2) of the Enforcement Decree of the Sewerage Act states that, when a public sewerage management authority determines the sewerage usage fee, "it shall do so based upon the amount of sewage that relevant users send down through the public sewerage system."[35]  The Incheon Metropolitan City Ordinance on Sewerage System Use contains very similar language:  Article 12(2) stipulates that the "public sewerage system fee shall be imposed and collected … based on the volume of sewage

---

[30] *See* Hyundai Steel's Letter, "Hyundai Steel's Initial Questionnaire Response," dated April 9, 2020 (Hyundai Steel April 9, 2020 IQR), at 56 and Exhibits G-21 and G-24.
[31] *See* GOK March 30, 2020 IQR at 141 and SEWER-4.
[32] *Id.* at SEWER-4; *see also* Hyundai Steel's Letter, "Hyundai Steel Case Brief," dated July 2, 2021 (Hyundai Steel Case Brief), at 20-21.
[33] *See* Hyundai Steel April 9, 2020 IQR at 57.
[34] *See Final Results* IDM at Comment 3.
[35] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).

discharged into the public sewerage system … ."[36]  Because it is not possible for municipalities to measure accurately the amount of sewage discharged into the public sewerage system due to the lack of gauges discussed above, the municipalities have attempted to estimate the amount of water discharged into the sewerage systems by tying that amount to the amount of water supplied to the user.

We previously determined in the *Final Results* that the laws and regulations "do not prescribe for the situation under which Hyundai Steel qualified for its sewerage fee reduction, or the amount of the reduction received by Hyundai Steel" and that "Article 21, or any other legal provisions cited by the GOK, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged."[37]  However, the record demonstrates that Hyundai Steel applied for the reduction under Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewerage System Use.[38]  While subparagraphs 1 through 6 of Article 21(1) reference specific circumstances under which users can qualify for a reduction, Article 21(1)(7) is a catch-all clause that states that a reduction can be granted in "{o}ther instances where the public sewerage management authority acknowledges public interest or any other special conditions."[39]  Further, although Article 21 does not explicitly mention a reduction based on the volume of water discharged by a participating company, it appears that such a reduction would not be excluded under the broadly defined language of Article 21(1)(7).

---

[36] *Id.*

[37] *See Final Results* IDM at Comment 3 (citing *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 85 FR 84296 (December 28, 2020) (*CTL Plate from Korea 2018*), and accompanying IDM at Comment 6).

[38] *See* Hyundai Steel April 9, 2020 IQR at 56.

[39] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).

Additionally, in the *Final Results*, we reasoned that "the amount of the fee reduction that Hyundai Steel received on its overall water bill significantly exceeds the rate adjustments that are specified in the ordinance, with the exception of certain special conditions, such as being located in a disaster area."[40]  The rate adjustments referenced in the quotation relate to rates that are specified in Appendix 4 of the Incheon Metropolitan City Ordinance on Sewerage System Use.[41]  There are four different adjustment rates in this appendix:  one rate for residential users; one rate for users in disaster areas; one rate for users that have installed a gray water system; and one rate for users that utilize reuse water from the public sewerage system.[42]  The disaster area adjustment rate is 100 percent, while the gray water system and reuse water adjustments are both 20 percent.[43]  Article 21(2) stipulates that the adjustment rates in Appendix 4 apply to subparagraphs 1-6 of Article 21(1); thus, Appendix 4 does not apply to reductions, like the one received by Hyundai Steel, granted under Article 21(1)(7).[44]  Specifically, in the case of Hyundai Steel, the reduction was based on a study it submitted (and the government accepted) that demonstrates the volume of water Hyundai Steel discharged into the public sewerage system. This reduction percentage, therefore, reflects the intent of the federal and municipal regulations that Hyundai Steel be billed based on the amount of water discharged into the sewerage system. The reductions specified in Appendix 4 are for very specific categories of users, *e.g.*, for users located in a disaster zone or those that utilize reuse water that are not attempting to demonstrate that the amount of water discharged into the sewerage system is different than the amount of

---

[40] *See Final Results* IDM at Comment 3 (citing *CTL Plate from Korea 2018* IDM at Comment 6).
[41] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).
[42] *Id.*
[43] *Id.*
[44] *Id.*

9

water supplied.  Accordingly, it is logical that Appendix 4 only applies to the narrow categories stipulated in subparagraphs 21(1)(1)-(6) and not 21(1)(7).

Moreover, in the *Final Results*, we determined that the basis on which "Hyundai Steel received a sewerage fee reduction during the POR is an arrangement unique to the respondent and not otherwise contemplated under the provisions of Korean law on our record."[45]  Following the receipt of further information in the GOK's supplemental questionnaire response, such a conclusion is no longer supported by the record.  The record demonstrates that Hyundai Steel was not unique in receiving support under Article 21(1)(7).  Instead, the record shows that many companies qualified for a reduction under Article 21(1)(7).[46]  Accordingly, we find that Hyundai Steel's sewerage fee reduction was not an arrangement unique to Hyundai Steel.

Further, we also do not find that the record supports a finding that the process used by Hyundai Steel to qualify for this reduction was an *ad hoc* arrangement.  Article 9 of the Enforcement Regulation on the Incheon Metropolitan City Ordinance on Sewerage System Use describes the government's process for evaluating applications submitted for a reduction under Article 21 of the Incheon Metropolitan City Ordinance on Sewerage System Use.[47]  In accordance with Article 9 of the enforcement regulation, Hyundai Steel submitted an application using the appropriate form with the required supporting documentation,[48] and the government conducted an assessment of that application and granted its approval.[49]

Therefore, after a reevaluation of the record, we find that the record does not support a finding that this program is countervailable.  Specifically, we determine that the record does not

---

[45] *See Final Results* IDM at Comment 3 (citing *CTL Plate from Korea 2018* IDM at Comment 6).
[46] *See* GOK March 8, 2023 SQR at 3.
[47] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).
[48] *See* Hyundai Steel April 9, 2020 IQR at Exhibit G-24.
[49] *Id*. at Exhibits G-21 and G-22.

support a finding that the reduction in Hyundai Steel's sewerage fee in Incheon represents revenue forgone, in accordance with section 771(5)(D)(ii) of the Act.  As discussed above, both federal and municipal regulations stipulate that sewerage fees shall be set according to the amount of sewage a user discharges into the public sewerage system.  Hyundai Steel qualified for a reduction in its sewerage bill by demonstrating to the government that it did not discharge into the public sewerage system a portion of the water it consumed.  Hyundai Steel complied with the municipal regulations by submitting an application for a reduction, citing a subparagraph of the ordinance that does not exclude such a reduction, and providing supporting evidence, which was reviewed and accepted by the government, regarding the volume of water discharged into the sewerage system.  Accordingly, there is no revenue forgone to the government because Hyundai Steel is simply billed for the service which it has used, according to the regulations that govern the applicable fees.

Because our analysis of the record and relevant Korean legal provisions demonstrates that the GOK did not provide a financial contribution under section 771(5)(D)(ii) of the Act in connection with Hyundai Steel's reduction in sewerage fees, Commerce has not further evaluated the countervailability of the program in terms of specificity under section 771(5A) of the Act or benefit under section 771(5)(E) of the Act.

### B. Provision of Port Usage Rights at the Port of Incheon

In the *Remand Order*, the CIT remanded for further consideration Commerce's benefit determination relating to the Provision of Port Usage Rights at the Port of Incheon.  The CIT found that Commerce erred when it did not provide an analysis "regarding adequate remuneration for port usage in relation to the prevailing market conditions, such as price, quality, availability, marketability, transportation, and *other conditions of purchase or sale*," and did not

provide an analysis of the record evidence to determine that the GOK provided usage of the port for less than adequate remuneration (LTAR).[50]  Below, we provide additional explanation to support Commerce's position that its benefit analysis was consistent with the Act and CVD regulations, and that the analysis corresponded with the facts of the underlying review. Specifically, we explain why:  (1) it would not be appropriate to analyze the port usage rights program in terms of adequacy of remuneration; and (2) the Act and regulations do not contemplate consideration of the "conditions of purchase or sale" and/or an alleged "excessive benefit" standard with respect to the subsidy program at issue.

>    1.  Commerce analyzed this program as revenue forgone and not in terms of
>        adequacy of remuneration.

Given the nature of the program, the Provision of Port Usage Rights at the Port of Incheon as examined in this proceeding is not a subsidy that is appropriately analyzed under an LTAR analysis.[51]  Here, Hyundai Steel and the GOK's Ministry of Oceans and Fisheries entered into an agreement regarding the construction of a port at North Incheon Harbor in August 2001 and a revised agreement in April 2009.[52]  Under this program, the GOK partnered with a private company (*i.e.*, Hyundai Steel) for the construction of harbor facilities under a build-transfer-operate agreement pursuant to the Act on Private Participation in Infrastructure.  Pursuant to the agreement, Hyundai Steel financed the construction and, pursuant to Korean law, ownership of the port facility reverted to the GOK in January 2007.[53]  Hyundai Steel received funds from the GOK between 2004 and 2007 for certain construction costs.[54]  Additionally, as part of the

---

[50] *See Remand Order* at 10 (citing section 771(5)(E) of the Act, emphasis in original).
[51] Moreover, during the underlying review, no interested party argued for an LTAR analysis or submitted benchmark data necessary for Commerce to conduct such an analysis.
[52] *See* Hyundai Steel April 9, 2020 IQR at 42.
[53] *Id*.
[54] The reimbursements provided to Hyundai Steel by the GOK between 2004 and 2007 were expensed in the year of receipt pursuant to 19 CFR 351.524(b)(2) because the amount of the grants (*i.e.*, the benefit) was less than 0.5

agreement, Hyundai Steel was granted a free use period for the port,[55] the right to manage and

operate the port,[56] and the use of state-owned or public property within the project site.[57]

Further, Hyundai Steel acquired the right to "collect fees from third-party users."[58]  However, no

third party has used the harbor.[59]  Although the agreement between Hyundai Steel and the GOK

extensively detailed the relationship between the parties, the aspect of the program analyzed (and

ultimately countervailed) by Commerce in this review was narrow:  the GOK's assignment to

Hyundai Steel of the right to collect certain port fees.

In the underlying administrative review, Commerce considered the financial contribution

that Hyundai Steel received pursuant to this program to be revenue forgone.  Specifically, we

stated, "the fees that the GOK gave Hyundai Steel the right to collect -- the berthing income and

the harbor facility usage fees -- which would otherwise have been collected by the GOK absent

the agreement between the parties, represent revenue forgone by the GOK within the meaning of

section 771(5)(D)(ii) of the Act."[60]  The CIT's holding did not disturb this finding.  The *Remand*

_____

percent of Hyundai Steel's relevant sales value.  Thus, these government payments to Hyundai Steel were not addressed or countervailed in the *Final Results*.

[55] *See* Hyundai Steel's Letter, "Hyundai Steel's Second Supplemental Questionnaire Response," dated January 21, 2021, at 10.

[56] *Id*.

[57] *See* GOK's Letter, "The Republic of Korea's Response to the Countervailing Duty Second Supplemental Questionnaire," dated January 21, 2021, at 7 (noting that investors may receive income "through ancillary business such as usage of the state owned property") and Exhibit PPP-1 ("{T}he project undertaker may use and benefit gratuitously from any State and public properties located in the predetermined area for the private capital inducement project"); *see also generally* Hyundai Steel April 9, 2020 IQR at Exhibit G-1 (Article 6).

[58] *Id*. at 43.

[59] *Id*.

[60] *See Preliminary Results* PDM at 17, unchanged in *Final Results* IDM at Comment 2 ("The GOK provided the benefit for this program through reimbursements as well as *forgoing revenue that the GOK was otherwise entitled to collect, such as berthing fees and other user fees*.") (emphasis added).  As noted above, the GOK also provided reimbursements in the form of grants pursuant to this program, but these grants were expensed well before the POR, and are inapplicable to Commerce's benefit analysis here.

*Order* correctly stated, "Hyundai Steel challenges only Commerce's benefit determination and does not challenge Commerce's determinations as to financial contribution and specificity."[61]

    *a.* *The Act and the SAA*[62] *distinguish between an LTAR analysis and revenue forgone analysis.*

The *Remand Order* states that Commerce's analysis was not supported by substantial evidence because Commerce did not consider the criteria laid out in section 771(5)(E) of the Act.[63]  However, this conclusion is inconsistent with our actual financial contribution analysis, which was conducted pursuant to section 771(5)(D)(ii) of the Act, and not applicable to the language referenced in section 771(5)(E) of the Act.  Specifically, in remanding the issue to Commerce, the *Remand Order* cited statutory language relating to the determination of a benefit under section 771(5)(E) of the Act with respect to "prevailing market conditions."[64]  That exact language does not apply to programs analyzed as revenue forgone, but instead applies "{f}or purposes of clause (iv)," which relates to a subsidy analysis "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration."  Specifically, the Act states:

> {f}or purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.[65]

---

[61] *See Remand Order* at 6.
[62] *See* Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act (URAA), H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 927.
[63] *See Remand Order* at 10.
[64] *Id*.
[65] *See* section 771(5)(E) of the Act.

Thus, the statutory language of section 771(5)(E) of the Act only applies to programs in which a government provides a financial contribution within either the meaning of section 771(5)(D)(iii) of the Act (the provision of goods or services, other than general infrastructure) or section 771(5)(D)(iv) of the Act (the purchase of goods).  It does not apply to subsidy programs analyzed under the revenue forgone provision, section 771(5)(D)(ii) of the Act.

This interpretation of the language of section 771(5)(E) is supported by the legislative history of the provision – specifically the SAA.[66]  The SAA is explicit that the benefit standards set forth within section 771(5)(E)(iv) of the Act, "less than adequate remuneration" and "more than adequate remuneration," are only relevant with respect to the provision of goods or services. The SAA states, in relevant part:

> {w}ith respect to the provision of goods or services, current law relies on a standard of 'preferentiality' to determine the existence and amount of a benefit. *Section 771(5)(E)(iv) {of the Act} replaces this standard with the standards from Article 14 of the Subsidies Agreement – 'less than adequate remuneration' (in the case of the provision of goods or services) and 'more than adequate remuneration' (in the case of procurement of goods).*[67]

Accordingly, the language of both section 771(5)(E) of the Act and the SAA supports the notion that the language at issue only applies to a financial contribution in the form of the provision of a good or service (or the government purchase of a good) and is inapplicable to the provision of a financial contribution in the form of revenue forgone.[68]

---

[66] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d); *see also Bosun Tools Co., Ltd. v. United States*, Court No. 21-1929 (Fed. Cir. 2022).

[67] *See* SAA at 927 (emphasis added).

[68] *See, e.g.*, sections 771(5)(D)(iii) and 771(5)(E)(iv) of the Act, relating to financial contribution and benefit analysis in the context of LTAR programs, respectively; *see also Nucor Corp. v. United States*, 927 F.3d 1243, 1251 (Fed. Cir. 2019) (noting that "the adequacy-of-remuneration language gives meaning to a provision that asks whether a producer is receiving a 'benefit' from a government authority (through sales of goods or services), as part of the definition of what counts as a 'subsidy'") (citing sections 771(5)(A) and (B) of the Act)).

        b. *An LTAR analysis and a revenue forgone analysis cannot be simultaneously applied to a subsidy program; either one, or the other, applies, and in this case, a revenue forgone analysis was appropriate.*

There are stark differences between programs that are analyzed under an LTAR analysis and those considered under a revenue forgone analysis, which would explain why the Act and SAA distinguish between these types of programs.  For example, an LTAR analysis relies on the application of a benchmark, whereby Commerce conducts a comparison to determine whether a good or service is provided for LTAR.[69]  However, with respect to financial contributions such as grants or revenue forgone, there is no need or basis to apply a benchmark to determine whether a benefit is conferred, because the benefit is the amount of the grant or the amount of the government fee that otherwise would have been paid in the absence of the program.  In other words, unlike in an LTAR analysis, when Commerce conducts a revenue forgone analysis, there is no need for the agency to select a benchmark to determine whether there is a benefit and no need for the agency to use a benchmark to ascertain the amount of the benefit.  Thus, the criteria which Commerce should consider in analyzing a subsidy program under an LTAR analysis is, by necessity, different from the criteria which Commerce should consider in analyzing a subsidy program under a revenue forgone analysis.

      For the purposes of this case, Commerce did not conduct an LTAR analysis because such an analysis would be inappropriate in light of the facts and nature of the subsidy program at issue.  As explained above, Hyundai Steel received funds from the GOK between 2004 and 2007 for certain construction costs, but Hyundai Steel reported no costs or payments for this POR, and

---

[69] Under 19 CFR 351.511, the preferences for a benchmark price are:  (1) a market-determined price for the good or service resulting from actual transactions in the country under investigation; and (2) absent market-determined prices within the country under investigation, Commerce will use world market prices for that good or service as the benchmark to determine whether the government good or service is being provided at adequate remuneration.  Finally, if there are no benchmarks available under (1) and (2), Commerce will assess whether the government price is consistent with market principles.

no party alleged the provision of a good or service by the GOK during the POR or in prior segments of this proceeding.[70]  Rather, the program at issue in this case pertained to Hyundai Steel's right to collect berthing income and other fees associated with port activity during the POR.  Pursuant to its analysis of that program, specifically, Commerce countervailed the GOK's assignment to Hyundai Steel the ability to collect certain port fees.  The ability to collect such fees (*i.e.*, fees otherwise payable to the government) cannot be construed as the provision of a good or service but is instead revenue forgone.[71]

> c.  *Various types of subsidies may relate in some way to a good or a service, but that does not necessarily mean that the application of an LTAR analysis is appropriate to those subsidies.*

We recognize that certain subsidy programs may bear a relationship to a good or service, but that does not mean that an LTAR analysis applies to those programs or that the government was providing a financial contribution to the recipient in the form of the provision of a good or service.  For example, Commerce has countervailed grant and loan programs that are provided to support research and development activities and assist recipients to purchase goods and services.[72]  Similarly, we have countervailed tax exemptions related to research and

---

[70] *See* Hyundai Steel April 9, 2020 IQR at 42.

[71] While the non-payment of a government-set or mandated fee or charge, like the port charges at issue here, represents the provision of a financial contribution in the form of revenue forgone, Commerce does recognize that a government fee or charge paid by a respondent company with respect to the provision of a good or service, under certain circumstances, can be considered a financial contribution within the meaning of section 771(5)(D)(iii) of the Act.  However, such circumstances were not present in the underlying *Final Results*.  No interested party made an allegation with respect to the provision of port services for LTAR.  There is nothing on the record that indicates that port fees established by the GOK are set at a rate that is for LTAR; additionally, there is no information on the record regarding whether the companies that pay port fees would constitute a specific group under section 771(5A) of the Act.  Therefore, there is no basis to conclude that the GOK is providing port services for LTAR.

[72] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, and the Republic of Korea: Final Results of Expedited Third Sunset Reviews of Countervailing Duty Orders*, 82 FR 16790 (April 6, 2017), and accompanying IDM at "Nature of the Subsidy" ("The GOK provides research and development grants to support numerous projects pursuant to the Industrial Development Act, including technology for core materials, components, and engineering systems, and resource technology.").

development, investment, and the purchase of capital assets and goods.[73]  In both of the

illustrative scenarios, the financial contribution – while related to a good or service – did not

constitute a financial contribution to the recipient in the form of the provision of a good or

service.

This interpretation is supported by section 771(5)(D) of the Act, as the direct transfer of

funds (such as grants and loans) are defined as financial contributions under section 771(5)(D)(i)

of the Act and tax exemptions are defined as financial contributions in the form of revenue

forgone under section 771(5)(D)(ii) of the Act.  In contrast, the government provision of a good

or service is separately addressed under section 771(5)(D)(iii) of the Act.  In addition, section

771(5)(E) of the Act provides separate and distinct methodologies for determining whether a

benefit is conferred by a loan (section 771(5)(E)(ii) of the Act) or from the government provision

of a good or service (section 771(5)(E)(iv) of the Act).  Thus, the Act treats grants, loans, and

exemptions from taxes/fees as distinct from the provision of goods and services.

The administrative precedent cited by Hyundai Steel in its submissions to Commerce and

in its briefs to the CIT does not warrant a conclusion to the contrary.[74]  Rather, the cases

reference a financial contribution in the form of revenue forgone or, in some cases, grants.[75]  The

---

[73] *See, e.g.*, *Wire Decking from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 32902 (June 10, 2010), and accompanying IDM at 27 (countervailing value-added tax refunds for foreign-invested enterprises purchasing domestically-produced equipment); and *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 FR 40480 (July 15, 2008), and accompanying IDM at 22-23 (countervailing exemptions of value-added tax and tariffs on purchases of imported equipment).
[74] *See* Hyundai Steel Case Brief at 5-8.
[75] *See, e.g.*, *Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002) (*CR from Korea 2000*), and accompanying IDM at Comment 11 ("Therefore, we find that the GOK is providing a financial contribution *in the form of revenue foregone* and that it is specific to Dongbu.") (emphasis added); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013) (*CORE from Korea 2011 Preliminary*), and accompanying PDM at 11 ("Moreover, we preliminarily determine that the GOK is *foregoing revenue that it would otherwise collect* by allowing Dongbu to be exempt from port charges for up to 70 years and, thus, the program constitutes a financial contribution within the

cases do not indicate that the subsidy in question was ever analyzed as an LTAR program, and therefore, the referenced language of section 771(5)(E) of the Act did not apply.

Accordingly, the Act and Commerce's regulations, as well as the facts of this case, all support the position that an LTAR analysis, and therefore, an analysis under section 771(5)(E) of the Act, does not apply to the subsidy program at issue in this case.  Commerce's treatment of this program as revenue forgone, which Hyundai Steel did not challenge and the *Remand Order* did not alter,[76] demonstrates that Commerce's analysis and benefit determination were fully consistent with the agency's statutory obligations.

2.   "Conditions of Purchase or Sale" and "Excessive Benefits"

As part of its analysis of Commerce's *Final Results*, the CIT noted that section 771(5)(E) of the Act requires Commerce to consider "other conditions of purchase or sale."[77]  Furthermore, the CIT cited arguments made by Hyundai Steel that Commerce,

> {s}hould have applied its 'excessive benefit' standard, by which Commerce determines that a benefit is conferred only if the period of port usage rights provided by the Government of Korea is excessive, and if Commerce had applied the 'excessive benefit' standard in the *Final Results*, Commerce would have determined that a benefit was not conferred.[78]

---

meaning of section 771(5)(D)(ii) of the Act.") (emphasis added), unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2011*, 79 FR 5378 (January 31, 2014) (*CORE from Korea 2011 Final*) (collectively, *CORE from Korea 2011*); *Notice of Final Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007) (*CTL Plate from Korea 2005*), and accompanying IDM at 6-7 and Comment 1 (finding that the respondent received a "direct financial contribution, in the form of grants, {which} confer a benefit within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act, respectively"); and *Final Affirmative Countervailing Duty Determination:  Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 64 FR 30636, 30649 (June 8, 1999) (finding the port program in question not specific, while noting that, prior to the specificity determination, Commerce found that "POSCO received the right to use the port facilities free of charge, and *the ability to charge other users a usage fee* until the company recovers all of its investment costs," and explaining that "because POSCO is exempt from paying port facility fees, which it otherwise would have to pay, and *the government is foregoing revenue that is otherwise due*, POSCO's free usage of the port facilities provided a financial contribution to the company within the meaning of section 771(5)(D)(ii) of the Act") (emphasis added).

[76] *See Remand Order* at 6.
[77] *Id.* at 10.
[78] *Id.* at 6-7 (citing Hyundai Steel Case Brief at 11-19).

For the reasons we have explained, the Act and SAA do not require Commerce to conduct an LTAR analysis in addition to its revenue forgone analysis based on the subsidy program at issue in this case.  However, in response to the CIT's *Remand Order*, we are addressing the "other conditions purchase or sale" argument.  In addition, we are also addressing the "excessive benefits" argument raised by Hyundai Steel and referenced by the CIT.[79]

> a. *Commerce was not required to consider the costs incurred by Hyundai Steel in constructing the port for purposes of its analysis of the subsidy program during the POR.*

At the outset, we emphasize that the costs incurred by Hyundai Steel in construction of the port are not considered, *i.e.*, as an offset, in determining the benefit provided by the GOK under the Act or Commerce's regulations.  The only authorized statutory adjustments that may be made in calculating and determining the net countervailable subsidy conferred by this program are set forth within section 771(6) of the Act, which states:

> (6) NET COUNTERVAILABLE SUBSIDY.—For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—
>
> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
>
> (B) any loss in the value of the countervailable subsidy

---

[79] We acknowledge Commerce's statement in the *Final Results* that "treatment of the benefit received here is further supported by Commerce's regulations at 19 CFR 351.503(b), which states that for other government programs, Commerce normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."  *See Final Results* IDM at Comment 2.  Commerce's quotation of this provision was intended to illustrate the wide range of benefit types that may be considered and countervailed in Commerce's subsidy analysis, and not to suggest that the GOK port program represents the provision of a good or service.  Indeed, it was the final phrase of the quotation – relating to a company's ability to "receive{ } more revenues than it otherwise would earn" – that Commerce was highlighting in its discussion.  Here, Hyundai Steel's participation in the GOK's port program permitted it to receive additional revenue, *i.e.*, revenue that was otherwise due to the GOK.

> resulting from its deferred receipt, if the deferral is
> mandated by Government order, and
>
> (C) export taxes, duties, or other charges levied on the
> export of merchandise to the United States specifically
> intended to offset the countervailable subsidy received.

Notably, expenses analogous to Hyundai Steel's costs in constructing the port are not included in

the list of factors Commerce is directed to consider in calculating the net countervailable

subsidy.

Moreover, section 771(5)(C) of the Act states that Commerce is not required to consider

the effect of the subsidy in determining whether a subsidy exists:

> (C) OTHER FACTORS.—The determination of whether a subsidy
> exists shall be made without regard to whether the recipient of
> the subsidy is publicly or privately owned and without regard
> to whether the subsidy is provided directly or indirectly on the
> manufacture, production, or export of merchandise. *The
> administering authority is not required to consider the effect of
> the subsidy in determining whether a subsidy exists under this
> paragraph.* (emphasis added).

Furthermore, 19 CFR 351.503 provides further elaboration with respect to this legal standard.

Under 19 CFR 351.503(c), in determining whether a benefit is conferred, Commerce "is not

required to consider the effect of the government action on the firm's performance, including its

prices or output, or how the firm's behavior is otherwise altered." In addition, the *CVD

Preamble* adds that "{p}aragraph (c) of the {} regulation reinforces this principle by stating

affirmatively that, in determining whether a benefit is conferred, {Commerce} is not required to

consider the effect of the government action on the firm's performance, including its prices or

output, or how the firm's behavior otherwise is altered."[80]  Moreover, the SAA states, "the {}

definition of subsidy does not require that Commerce consider or analyze the effect (including

---

[80] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65361 (November 25, 1998) (*CVD Preamble*).

whether there is any effect at all) of a government action on the price or output of the class or kind of merchandise under investigation or review."[81]

Thus, under the Act and the CVD regulations, the fact that Hyundai Steel may have altered its behavior or incurred a cost to construct the Incheon port is not a factor which Commerce must consider in determining the benefit conferred upon Hyundai Steel through receipt of the right to collect port usage fees.[82]

The *CVD Preamble* provides additional clarity with respect to this concept using two examples.[83]  First,

> assume that a government puts in place new environmental restrictions that require a firm to purchase new equipment to adapt its facilities.  Assume also that the government provides the firm with subsidies to purchase that new equipment, but the subsidies do not fully offset the total increase in the firm's costs – that is, the net effect of the new environmental requirements and subsidies leaves the firm with costs that are higher than they previously were.[84]

A subsidy still exists, and the imposition of the environmental regulations and the subsidies to help the firm comply with the new environmental requirements are two separate government actions:  "{a} subsidy that reduces a firm's cost of compliance remains a subsidy (subject, of course, to the statute's remaining tests for countervailability), even though the overall effect of the two government actions, taken together, may leave the firm with higher costs."[85]  In addition, the *CVD Preamble* provides a second example on this point.  It states, "if a government

---

[81] *See* SAA at 926.

[82] We also note that – in light of the long-term usage period the GOK provided to Hyundai Steel, and the fact that no other party has used the port to date – construction of the port does not constitute general infrastructure.  *See Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM at Comment 86 ("The activities performed by Resolute, such as building roads to access harvesting areas on Crown land, were performed in the furtherance of Resolute's harvesting activities, not to render a service to the Government of Ontario.  Because we find Resolute's construction of roads to further its harvesting abilities, we do not find this to be "general infrastructure" as defined under 19 CFR 351.524(d) as infrastructure that is created for the broad societal welfare of a country, region or municipality.").

[83] *See CVD Preamble*, 63 FR at 65361.

[84] *Id.*

[85] *Id.*

promulgated safety regulations requiring auto makers to install seat belts in back seats, and then gave the automakers a subsidy to install the seat belts, {Commerce} would draw the same conclusion."[86]

In these two examples, the government action that constitutes the benefit is the subsidy to install the equipment, because the action represents an input cost reduction. The government action represented by the requirement to install the equipment in the first instance cannot be construed as an offset to the subsidy provided to reduce the costs of installing the equipment.[87] Thus, if a government provides a financial contribution and a firm receives revenues beyond the amount it otherwise would earn, that is the end of the inquiry insofar as the benefit element is concerned. Commerce need not consider how Hyundai Steel's behavior or costs are altered when it received a financial contribution that lowers its costs or increases its revenues.[88]

> b. Commerce has no "excessive benefit" standard/practice.

Hyundai Steel also asserted to the CIT, and to Commerce in the underlying review, that Commerce applies an "excessive benefit" standard when determining whether to countervail infrastructure-related programs that result in the provision of rights and/or reimbursement to private parties, such as in the context of public-private port construction in Korea.[89] Hyundai Steel alleged that, under this precedent, it is Commerce's practice to find that the government provision of port usage rights provides a benefit where the applicable benefit stream lasts longer than the average useful life (AUL) of the underlying asset, and that where the exemption/fee-

---

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *See* Hyundai Steel Case Brief at 2-18; *see also Remand Order* at 6-7 (stating that "Hyundai Steel argues that Commerce should have applied its 'excessive benefit' standard, by which Commerce determines that a benefit is conferred only if the period of port usage rights provided by the Government of Korea is excessive" and asserting that "if Commerce had applied the 'excessive benefit' standard in the *Final Results*, Commerce would have determined that a benefit was not conferred").

collection period is equal to or greater than the AUL period, the subsidy is "excessive" and represents a benefit.[90]

The implication of Hyundai Steel's argument is that, when a government provides benefits for such a lengthy period, it results in the constructive ownership of the underlying assets.[91]  Accordingly, in its examination of Commerce precedent, Hyundai Steel asserted that the 50-70 year periods involved in cases such as *CR from Korea 2000* and *CTL Plate from Korea 2005* were found to be excessive because they were equal to or exceeded the AUL periods for the assets, and effectively granted ownership to the respondent.[92]  In contrast, Hyundai Steel argued that the duration of the agreement between Hyundai Steel and the GOK in this case was for less time (approximately 42 years), and therefore, did not result in a countervailable benefit.

Commerce fundamentally disagrees with Hyundai Steel's characterization of an alleged "excessive benefit" standard and practice.  Moreover, even if such an analysis did exist, applying this framework of analysis would not lead to a different result in this case.

First, it should be clear from the explanation of benefit, subject to section 771(5)(C) of the Act and 19 CFR 351.503 provided above, that application of an "excessive benefit" standard would be inconsistent with both the Act and the CVD regulations with regard to the determination of the benefit conferred by a government financial contribution.  Once Commerce has determined that a benefit exists, Commerce is not required to assess the costs or modified business practices that resulted from the provision of the subsidy – *i.e.*, it is not required to

---

[90] *See* Hyundai Steel Case Brief at 5 (citing *CR from Korea 2000* IDM at Comment 11).
[91] *Id.* at 6-7.
[92] *Id.* at 5-7 (citing *CR from Korea 2000* IDM at Comment 11; and *CTL Plate from Korea 2005* IDM at Comment).

consider the effects of the subsidy.  Thus, Hyundai Steel's cost are not pertinent to the question

of whether the subsequent subsidization from the GOK[93] constitutes a benefit.

Moreover, although the CIT found that the record of the instant case differs from *AK Steel Corp.*,[94] Commerce believes *AK Steel Corp.* supports the benefit analysis, as described above, because the U.S. Court of Appeals for the Federal Circuit (CAFC) sustained Commerce's prior determination to reject similar arguments that the exemption of port fees was merely a reimbursement by the GOK for costs incurred in building the port, and that the relevant fee exemptions provided a countervailable benefit regardless of who built the port.[95]

Second, Hyundai Steel mischaracterized key holdings in the prior cases.  For instance, Commerce determined in *CR from Korea 2000* that, "as only Dongbu has received a 70 year exemption period, we find this excessive exemption period is *specific* to Dongbu under {section} 771(5A)(D)(iii)(I) of the Act."[96]  In the 2011 administrative review of the CVD order on CORE from Korea, Commerce determined that "the program is specific under section 771(5A)(D)(iii)(I) of the Act because the excessive exemption period of 70 years is limited to Dongbu."[97]  Thus, the "excessive" period related to Commerce's determination of specificity, not to the calculation of benefit.[98]  In the *Final Results* of this review, in contrast, Commerce did not rely on the length

---

[93] As discussed above, such subsidization relates to the right to collect certain fees and, in prior periods not relevant for this POR, grants from the GOK.

[94] *See Remand Order* at 8-9 ("Although the salient facts recounted in *AK Steel Corp.* may be similar to the facts in this case, the standard of review is whether Commerce's benefit determination is supported by substantial evidence, and the instant case differs from *AK Steel Corp.* in the evidence on the administrative record.") (citing *AK Steel Corp. v. United States*, 192 F. Supp. 1367, 1379-82 (Fed. Cir. 1999) (*AK Steel Corp.*)).

[95] *See AK Steel Corp.*, 192 F. Supp. at 1379-82.

[96] *See CR from Korea 2000* IDM at 21 (emphasis added).

[97] *See CORE from Korea 2011 Preliminary* PDM at 11, unchanged in *CORE from Korea 2011 Final.*

[98] We note that a countervailable subsidy is determined by making three different determinations based on three different analyses.  Commerce must ask if there is a financial contribution, if that financial contribution provided a benefit, and if that subsidy is specific.  The "excessive" period analysis pertained to a specificity analysis, not a benefit analysis, and this conclusion is further supported by Commerce's explanation of the benefit calculation in those cases, which did not make reference to any proportional assignment of a benefit based on what was deemed "excessive."  *See, e.g.*, *CR from Korea 2000* IDM at Comment 11 ("As noted earlier, the benefit is the full amount

of the exemption period as the basis for a specificity finding because the program was found to

be specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients were limited in

number.

Commerce has, in the past, observed that usage agreements for port facilities that cover a

sufficiently long period of time (*e.g.*, from 50 to 70 years) effectively render "ownership" of the

port facilities to the respondent company.[99]  Such observations were made by Commerce in

response to arguments that the GOK owned the port facilities as required under Korean law.[100]

However, as discussed with respect to the determination of benefit set forth under section

771(5)(C) of the Act and 19 CFR 351.503, and the statutory requirement under section 771(5)(E)

of the Act that the determination of a benefit will be based on the benefit to the recipient, the

actual ownership of the port facilities is not relevant in determining and calculating the benefit

provided to Hyundai Steel under this program.  The *CVD Preamble* clearly states with respect to

the CVD benefit regulation at 19 CFR 351.503:

> if there is a financial contribution and a firm pays less for an input than it would
> otherwise pay in the absence of that financial contribution, *or receives revenues
> beyond the amount it would earn, that is the end of the inquiry as the benefit
> element is concerned.*[101]

Third, even assuming *arguendo* that the standard proposed by Hyundai Steel were

applicable to the context of this case, the outcome would still be to countervail the program.  The

Hyundai Steel-GOK agreement here provides that "Hyundai Steel was granted port usage rights

---

of the yearly exemption provided to Dongbu under this program."); *CORE from Korea 2011 Preliminary* PDM at 11
("Further, we preliminarily determine that the exemptions confer a benefit under section 771(5)(E) of the Act in the
amount of the port charges that were not collected."), unchanged in *CORE from Korea 2011 Final*; and *CTL Plate
from Korea 2005* IDM at 7 ("To calculate the benefit under this program, we first summed the amount of payments
{respondent} DSM received each year under the program.").
[99] *See, e.g.*, *CTL Plate from Korea 2005* IDM at Comment.
[100] *See, e.g.*, Hyundai Steel Case Brief at 11-14.
[101] *See CVD Preamble*, 63 FR at 65361 (emphasis added).

for the facility it constructed at Incheon Harbor for approximately 41 years and 8 months."[102]
Hyundai Steel, in its financial statements, considered the intangible asset of "exclusive dock use
rights" to have an estimated useful life of 42 years, and also indicated that buildings, structures,
and machinery have estimated useful lives of 15 to 50 years, five to 40 years, and five to 30
years, respectively.[103]   Additionally, the class life period for docks and wharves is 20 years.[104]
Thus, the record indicates that the length of the Hyundai Steel-GOK agreement did, in fact, equal
or exceed the applicable AUL period.

   For the reasons stated above, we continue to find that the Provision of Port Usage Rights
at the Port of Incheon program confers a benefit to Hyundai Steel and that the program conferred
a benefit in the amount of 0.01 percent to Hyundai Steel during the POR.

## IV. COMMENTS ON DRAFT RESULTS OF REDETERMINATION

   As noted above, Nucor and Hyundai Steel submitted comments on the Draft Results
regarding Commerce's discussion of the Provision of Port Usage Rights at the Port of Incheon
program.[105]   The comments are addressed, below.

*Hyundai Steel Comments*[106]

- First, Commerce wrongly characterizes the basis for its port rights program
  determination.  Commerce's quotation of 19 CFR 351.503(b) in the *Final Results*, which
  contains language mimicking the adequacy of remuneration language of the Act at
  section 771(5)(E), supports a finding that the program is appropriately analyzed as an
  LTAR program.  Regardless, there is no statutory basis to conclude that consideration of

---

[102] *See* Hyundai Steel April 9, 2020 IQR at 43.
[103] *See* Hyundai Steel's Letter, "Response to Affiliated Companies Section of Initial Questionnaire," dated March 6, 2020, at Exhibit 21.
[104] *See* NFI Memorandum at Attachment.
[105] *See generally* Nucor Comments; and Hyundai Steel Comments.
[106] *See* Hyundai Steel Comments at 2-14.

the "prevailing market conditions" and "other conditions of purchase or sale" only applies to instances where the financial contribution finding is based on the existence of an LTAR or more than adequate remuneration (MTAR) program.[107]

- Here, the "prevailing market conditions" and "other conditions of purchase or sale" are the fact that the GOK's port program provided rights to Hyundai Steel as reimbursement for construction of the port. Accordingly, Commerce must take into consideration the fact that the GOK's provision of port rights were compensation for Hyundai Steel's construction costs, and that the length of the usage period was calibrated so that Hyundai Steel would recoup its costs and nothing more. This same principle is also consistent with the principles of *GOSL*, which require Commerce to examine a program in its entirety when evaluating countervailability.[108]

- Second, instead of applying an LTAR analysis to the port program as directed by the CIT, Commerce's Draft Results focus on irrelevant issues. Consideration of the statutory offset criteria under section 771(6)(A) of the Act is unnecessary, because neither Hyundai Steel nor the CIT asserted that the provision is applicable. Similarly, discussion of whether Commerce must consider the "effect of the subsidy" under section 771(5)(C) of the Act is unnecessary. Again, neither Hyundai Steel nor the Court asserted that Commerce is required to consider the effect of the port rights in determining if a countervailable benefit exists.

- Third, Commerce's prior decisions sensibly consider whether the GOK's reimbursement for port construction costs in Korea is excessive. Consideration of potentially "excessive benefits" in prior cases was essential to Commerce's analyses and had implications

---

[107] *Id.* at 2-5.
[108] *Id.* at 7 (citing *Government of Sri Lanka v. United States*, 308 F. Supp. 3d 1373 (CIT 2018) (*GOSL*)).

beyond Commerce's finding of specificity in those scenarios.[109]  Moreover, with respect to *AK Steel Corp.*, the facts of that case are distinct from the facts here; there, the respondent was arguably given free ownership rights, whereas Hyundai Steel was given the right to collect fees.[110]

- Finally, Commerce's application of an excessive benefit standard to the facts of this case is flawed.  Commerce cites various AUL periods in Hyundai Steel's financial statements to argue that the duration of the port rights met or exceeded the AUL periods in question.  However, these AUL periods range from 14 to 50 years and, thus, it is not clear that the 41 year and eight month usage period provided to Hyundai Steel for the port exceeds the AUL period.  More importantly, the AUL period is just one indicator used by Commerce to determine whether the provision of rights by the GOK to Hyundai Steel results in effective ownership of the port and, accordingly, provides an excessive benefit.  Regardless of the length of time for which Hyundai Steel was given the right to collect berthing income and usage fees from other third party users of the port, it was not given any ownership rights to the port.

*Nucor Comments*[111]

- The GOK provided Hyundai Steel with various benefits relating to the company's operation and use of the Incheon wharf:  direct reimbursements from the GOK for certain construction costs; exemptions from paying certain fees to the GOK related to its use of the wharf; and the right to collect fees from shipping operators and third-party users of the wharf, such as berthing income and harbor facility usage fees.  In its appeal, Hyundai

---

[109] *Id.* at 11-13 (citing *CR from Korea 2000* IDM; and *CORE from Korea 2011 Preliminary Results* IDM, unchanged in *CORE from Korea 2011 Final Results*).
[110] *Id.* at 12 (citing *AK Steel Corp.*).
[111] *See* Nucor Comments at 2-6.

Steel challenged the countervailability of the third set of benefits, which Commerce countervailed as revenue forgone.

- Section 771(5)(E) of the Act stipulates that, when a benefit takes the form of the provision of goods or services provided for LTAR/MTAR, the adequacy of remuneration shall be determined in relation to prevailing market conditions and the conditions of purchase or sale. These requirements do not apply where, as here, the benefit clearly does not take the form of the provision of goods or services under section 771(5)(E)(iv) of the Act.

- The CIT has, in effect, asked Commerce to conduct an LTAR analysis; such an analysis is neither required nor appropriate. As Commerce explained in the Draft Results, the statutory language does not contemplate applying an LTAR analysis to revenue forgone programs (or treating a program as both revenue forgone and the provision of a good/service).

- Commerce also properly addressed issues raised by the CIT and Hyundai Steel, and explained that Commerce was not required to account for the construction costs incurred by Hyundai Steel in its benefit analysis. Further, Commerce refuted, in detail, the existence of an "excessive benefit" standard and, moreover, noted that application of such a standard would not change Commerce's benefit analysis in this case.

**Commerce's Position:** We continue to find that the benefit analysis Commerce applied to the port program – supported by the additional explanation provided in these final results of redetermination – is consistent with the Act and CVD regulations, and is supported by

substantial evidence on the record.[112]  Therefore, we continue to find that it is inappropriate to

analyze the port usage rights program, as alleged and countervailed in the *Final Results*, in terms

of adequacy of remuneration.

In its comments on the Draft Results, Hyundai Steel first argues that Commerce "wrongly

characterizes the basis for its port rights program benefit determination" on remand and asserts

that Commerce's benefit finding in the *Final Results* was, in fact, *intended* to be based on an

LTAR analysis.[113]  This interpretation of the record is plainly incorrect.  In support of its

argument, Hyundai Steel notes that a block quote from Commerce's *Final Results* IDM contains

language that is related to the provision of goods or services.  The quotation reads:

> {w}e further clarify that the benefit received is further supported by Commerce's
> regulations at 19 CFR 351.503(b), which states that for other government
> programs, the Secretary normally will consider a benefit to be conferred where a
> firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise
> would pay in the absence of the government program, or receives more revenues
> than it otherwise would earn.  Here, Hyundai Steel was able to collect berthing
> fees and other fees and was not required to remit those fees to the GOK.  Thus, a
> benefit was conferred under 19 CFR 351.503(b) under this program.[114]

As explained above, it was the portion of the quote regarding *additional revenue* (*i.e.*, "receives

more revenues than it otherwise would earn") that Commerce was emphasizing in the underlying

*Final Results*.  Commerce's statement is supported by the fact that, under the program in

question, Hyundai Steel was given the right to *collect revenue* that it otherwise would not have

earned had such fees been provided to the GOK.  Despite this, Hyundai Steel observes that the

quotation also contains language related to adequacy of remuneration and asserts that "{t}he

---

[112] *See* section III.B.1, "Commerce analyzed this program as revenue forgone and not in terms of adequacy of remuneration," *supra*.
[113] *See* Hyundai Steel Comments at 2.
[114] *Id.*; *see also Final Results* IDM at 28.

Court thus sensibly concluded that Commerce's benefit determination was an LTAR one."[115] This interpretation is unsupported by the record and is a misinterpretation of Commerce's findings, given that Commerce never stated that it was applying an LTAR analysis to the program and never referenced a concomitant benchmark analysis.  In fact, Hyundai Steel itself stated in the underlying review that "{i}t could hardly be said that the provision of port usage rights could fit into any of the enumerated categories listed in section 771(5)(E) {of the Act}."[116] Now, in a change of course, Hyundai Steel argues that section 771(5)(E)(iv) of the Act does apply to the program at issue.

An examination of 19 CFR 351.503 itself also supports such a conclusion.  The regulations, at 19 CFR 351.503(a), reference subsidy programs for which there are "Specific Rules" governing the measurement of a benefit.  For instance, calculation of a benefit for programs relating to the provision of goods or services is covered by 19 CFR 351.511; similarly, grants are covered by a dedicated provision at 19 CFR 351.504.  In contrast, 19 CFR 351.503(b) explicitly relates to "other subsidies," *i.e.*, those not covered by dedicated rules.  Thus, Commerce's citation to 19 CFR 351.503(b) cannot be construed as a reference to the LTAR/MTAR provisions.  Here, due to the unique nature of the program, wherein the GOK granted a private party the right to collect fees (*i.e.*, a situation not explicitly described in the "Specific Rules"), Commerce cited 19 CFR 351.503(b) in support of the proposition that – regardless of the unique nature of the benefit – Commerce appropriately countervailed the program.

Hyundai Steel also argues that no statutory provision links the "prevailing market conditions" and "conditions of purchase or sale" language solely to programs that are found to

---

[115] *See* Hyundai Steel Comments at 4.
[116] *Id.* at 9.

reflect the provision of goods/services for a financial contribution analysis.[117]  Stated differently, Hyundai Steel suggests that Commerce could find a program to be revenue forgone for the purposes of a financial contribution analysis but still subject to the requirements of section 771(5)(E) of the Act regarding adequacy of remuneration.  This interpretation is not supported by the construction of the Act.  Section 771(5)(E)(iv) of the Act, when read together with the subclause below it, states that, "in the case where goods or services are provided," the "adequacy of remuneration shall be determined in relation to prevailing market conditions *for the good or service being provided*."[118]  The immediately preceding sub-section (*i.e.*, section 771(5)(D) of the Act), which addresses financial contribution, identifies "providing goods or services"[119] separately from other types of financial contributions, such as "foregoing or not collecting revenue that is otherwise due."[120]  Thus, the Act separately lists the provision of goods or services as a type of financial contribution and then, in the immediately subsequent provision, separately references the provision of goods or services (twice) in the context of defining certain types of benefits.  Given the clear categorization of subsidy programs in this manner, we disagree with Hyundai Steel's assertion – in clear contradiction to its position in the administrative proceeding – that the adequacy of remuneration language would apply to revenue forgone programs as well as programs relating to the provision of goods or services.

Hyundai Steel does not cite a single case in support of its interpretation.  As explained above, despite the extensive judicial/administrative precedent cited and discussed in the *Final*

---

[117] *Id.* at 3.
[118] *See* section 771(5)(E) of the Act (emphasis added).
[119] *See* section 771(5)(D)(iii) of the Act.
[120] *See* section 771(5)(D)(ii) of the Act.

*Results* and related briefing, none of the cases employed an LTAR analysis for a similar port program,[121] and Hyundai Steel did not suggest otherwise in the underlying review.

Here, Commerce countervailed Hyundai Steel's right to collect payments that were otherwise payable to the GOK as revenue forgone, and the calculation did not relate to a "good or service being provided."[122]  This conclusion holds whether considering section 771(5)(D) of the Act for a financial contribution analysis or 771(5)(E) of the Act for a benefit analysis.  The CIT already sustained, and no party challenged, Commerce's conclusion with respect to our financial contribution determination.[123]  With respect to the benefit determination, given that our analysis did not concern a "good or service being provided" under the program in question, references to "prevailing market conditions" and "conditions of purchase or sale" are inapplicable based on the plain language of the Act.[124]

We also disagree with Hyundai Steel's assertion that our discussion of the statutory offset criteria under section 771(6)(A) and the "effect of the subsidy" under section 771(5)(C) of the Act is unnecessary.  With respect to the former, Hyundai Steel asserts that it never requested a statutory offset.  That is correct and, indeed, Hyundai Steel would not qualify for one.  However, this provision also highlights that the Act provides a very narrow set of circumstances under which a benefit may be reduced by a related cost pursuant to section 771(6)(A) of the Act,

---

[121] *See* note 75, and cases cited therein, *supra*.

[122] Moreover, references to the statutory provision in the *CVD Preamble*, in the context of discussing 19 CFR 351.511, make clear that the LTAR language relates to price comparability when applying a benchmark for comparison.  *See CVD Preamble*, 63 FR at 65377.  We did not rely on a benchmark here, as doing so was unnecessary under a revenue forgone analysis.

[123] *See Remand Order* at 6.

[124] Hyundai Steel also asserts that the legal principles of *GOSL* support an analysis of the costs associated with constructing the port in determining whether the right to fees represents a countervailable benefit.  However, as explained in the underlying review and in these final results of redetermination, the port program is distinct from the program under consideration in that case, because "{t}he GOK did not require Hyundai Steel to build a port at a certain cost, nor did the GOK require Hyundai Steel to build a port in order to benefit other recipients"; rather, "Hyundai Steel benefitted from building the port" and, in fact, is the only party to have used the port to date.  *See Final Results* IDM at 23; *see also* Commerce's discussion of section 771(5)(C) of the Act, *infra*.

*i.e.*, where the cost in question is an "application fee, deposit, or *similar payment* paid in order to qualify" for a program.  The costs associated with port construction cannot be considered "similar to" an applicable fee.  Accordingly, Commerce noted this in the context of its discussion regarding the provision enumerating allowable offsets to demonstrate that Hyundai's costs of construction are not relevant to our benefit analysis.

With respect to our discussion of section 771(5)(C) of the Act, Hyundai Steel asserts that the provision – and the corresponding examples in the *CVD Preamble* – are inapposite.[125]  The provision states that Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists," and the two cited examples stand for the proposition that a government action causing the imposition of a cost should be considered separate from a benefit that offsets that cost.  Here, Hyundai Steel and the GOK entered an agreement under which Hyundai Steel would construct a port, and the GOK provided various benefits to Hyundai Steel as a result, regardless of the costs incurred.  Hyundai Steel asserts that the examples contained in the *CVD Preamble* – instances where the government required companies to purchase equipment, but then provided subsidies for the equipment – are different from Hyundai Steel's scenario because, there, the hypothetical company owned the equipment as an asset.

We do not find that the alleged distinction is meaningful for purposes of this remand redetermination.  First, as noted throughout these final results of redetermination, Hyundai Steel was given the right to operate the port for an extended period of time that amounted to constructive ownership, and it is the only party that has used the port to date.  The fact that ownership of the port legally reverts to the GOK is more form over substance and is not a meaningful difference from the cited examples.  Second, in the two examples in the *CVD*

---

[125] *See* Hyundai Steel Case Brief at 10.

*Preamble* discussed above, the government *required* that a company incur a cost; nonetheless, that cost does not constitute a consideration that undermines or offsets the subsidy benefit. Here, the GOK did not require that Hyundai Steel build a port – Hyundai Steel elected to do so, plainly for its own benefit. Thus, there is no justification as to why the principle laid out in section 771(5)(C) of the Act and the *CVD Preamble* is not applicable; rather, the underlying principle is particularly relevant here.

Hyundai also claims in its arguments that the CAFC precedent, *AK Steel Corp.*, is not controlling because the case was decided under pre-URAA law, and in *AK Steel Corp.*, the respondent was arguably given ownership-type rights via free usage, whereas here Hyundai Steel was given the right to collect certain fees from third party users of the port as reimbursement.[126] Although the *AK Steel Corp.* decision involved pre-URAA law, the Act, as amended, does not mandate a different conclusion. Hyundai Steel argues that "'benefit conferred,'… prior to the URAA had not been a statutory requirement."[127] However, Hyundai Steel's position ignores the analysis conducted by the CAFC in *AK Steel Corp.* that "Commerce must determine whether a governmental program *provided a benefit* to a specific industry."[128] Thus, while the language in section 771(5)(E) may not have existed in the Act at the time, the requirement that Commerce determine whether a subsidy program provided a benefit did exist at that time.[129]

Regarding Hyundai Steel's second argument, that the *AK Steel Corp.* respondent was arguably given ownership-type rights, as we have explained, Commerce also determined that in this case Hyundai Steel was given the right to operate the port for an extended period of time that

---

[126] Hyundai Steel Remand Comments at 12.
[127] *Id.*
[128] *See AK Steel Corp.*, 192 F. Supp. at 1372 (emphasis added).
[129] *Id.*, 192 F. Supp. at 1382 (holding "that { } POSCO's exemption from dockyard user fees *constituted a countervailable benefit* are supported by substantial evidence.") (emphasis added).

amounted to constructive ownership, and it is the only party that has used the port to date.  Thus, there is no realistic distinction between the rights provided to the respondent in *AK Steel Corp.* and the rights provided to Hyundai Steel in this case.

Next, Hyundai Steel asserts that Commerce's prior decisions appropriately consider whether the GOK's reimbursement for port construction is excessive, and it contends that "this is a logical way to view these programs because if the port rights granted to the respondent do not exceed the costs incurred to build the port then there is no basis to determine that the respondent has received a countervailable benefit."[130]  Hyundai Steel also claims that the excessive duration of the rights period was considered in the context of Commerce's benefit analysis in *CR from Korea 2000* and *CORE from Korea 2011*.  As explained at length above, the duration of the rights period is related to our specificity determination, and not our benefit determination.  In *CR from Korea 2000*, Commerce stated that the benefit was the "full amount of the yearly exemption" and did not indicate that the benefit would be a pro-rated amount to reflect a purportedly excessive portion of benefit.[131]  Similarly, in *CORE from Korea 2011*, Commerce stated that the program provided a benefit "in the amount of the port charges that were not collected."[132]  In neither instance did Commerce state that the benefit was somehow negated, adjusted, or otherwise offset to account for only the purportedly excessive portion of a benefit.

Finally, we continue to find, even assuming *arguendo* that Hyundai Steel's proposed standard is correct, that applying that very standard still results in a finding that the program is countervailable, because the duration of the rights provided to Hyundai Steel exceed the

---

[130] *See* Hyundai Steel Case Brief at 11.
[131] *See CR from Korea 2000* IDM at Comment 11 ("As noted earlier, the benefit is the full amount of the yearly exemption provided to Dongbu under this program.").
[132] *See CORE from Korea 2011 Preliminary* PDM at 11 ("Further, we preliminarily determine that the exemptions confer a benefit under section 771(5)(E) of the Act in the amount of the port charges that were not collected."), unchanged in *CORE from Korea 2011 Final.*

applicable AUL period.  Hyundai Steel notes that the various AULs listed in its financial

statements range from 14 to 50 years, and, thus, that it is not clear that the 41 year and eight

month usage period provided for the port strictly exceeds the AUL period.  Hyundai Steel never

discusses the IRS Class life document placed on the record of this remand, which also shows that

the nearly 42-year period granted to Hyundai Steel substantially exceeds the useful life of the

underlying assets.  In apparent recognition of this, Hyundai Steel backtracks on its arguments,

now stating that "the AUL period is just one barometer used by Commerce to determine whether

the provision of rights by the GOK constituted effective ownership and, thus, an excessive

benefit."[133]  This constitutes another reversal from Hyundai Steel's position in the underlying

proceeding, where it argued in favor of relying on useful life periods to conduct the "excessive

benefit" analysis.  In discussing *CR from Korea 2000* and *CTL Plate from Korea 2005*, Hyundai

Steel argued that:

> {c}entral to this determination was that {Commerce} found that Dongbu received
> more than just a limited exemption on its harbor fee{,} *{i}t also received*
> *compensation which lasted longer than the useful life in of {sic} the constructed*
> *assets.*
>
> …
>
> *{F}or most industries and most types of industries, the IRS tables have provided*
> *an accurate and fair approximation of the AUL of assets in the industry in*
> *question.*  Thus, {Commerce} determined that {Dongkuk Steel Mill Co., Ltd.'s
> (DSM)} 50-year free use period constitutes a period of time so great that the
> GOK's *compensation outlasts the useful life of the constructed assets and*
> *effectively renders ownership of the facility to DSM.*[134]

In short, Hyundai Steel previously favored relying on the applicable AUL period when it

understood the period to be in excess of the GOK-Hyundai Steel port agreement duration.  Now,

---

[133] *See* Hyundai Steel Case Brief at 14.
[134] *Id.* at 5-6 (internal citations and quotations omitted).

with the applicable class life table placed on the record, Hyundai Steel downplays the relevance of the standard it previously proposed and supported.

For the reasons discussed, we continue to disagree that Commerce has, or should, apply a so-called excessive benefit standard to determine whether port rights are countervailable. However, even if we did so here, Hyundai Steel's arguments on this matter would not change our conclusion with respect to this program.

## V.     FINAL RESULTS OF REDETERMINATION

For these final results of redetermination, we find that the Reduction for Sewerage Fees program is not countervailable and we have provided additional explanation as to why the Provision of Port Usage Rights at the Port of Incheon program confers a benefit.  As a result of the modifications made in these final results of redetermination, we find that Hyundai Steel's overall subsidy rate for the POR is 0.50 percent.

4/7/2023

X   
_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance