**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>        Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>          and<br><br>NUCOR CORPORATION,<br>SSAB ENTERPRISES, INC., and<br>STEEL DYNAMICS, INC.<br><br>        Defendant-Intervenors. | **NON-CONFIDENTIAL**<br>Proprietary Information<br>Removed from Page 8<br><br>Court No. 21-00536 |

**PLAINTIFF HYUNDAI STEEL COMPANY'S COMMENTS ON COMMERCE'S
REDETERMINATION PURSUANT TO COURT REMAND**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

May 8, 2023

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Hyundai Steel Company*

14013807–1

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 2

    A.  The *Final Remand* Wrongly Characterizes The Basis For Its Port Rights Program Benefit
        Determination. ................................................................................................ 4

    B.  Instead of Considering The "Other Conditions of Purchase or Sale" As Part of Its
        Analysis of The Port Rights Program, Commerce Focuses On Irrelevant Issues. .......... 11

    C.  Commerce's Prior Decisions Sensibly Consider Whether The Reimbursement For Port
        Construction in Korea Is Excessive. ................................................................. 14

III. CONCLUSION ................................................................................................ 19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
   192 F.3d 1367 (Fed. Cir. 1999)............................................................................17, 18

*Government of Sri Lanka v. United States*,
   308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ......................................10, 11, 12, 15

*Zhaoqing Tifo New Fibre Co. v. United States*,
   256 F. Supp. 3d 1314 (Ct. Int'l Trade 2017) ..........................................................15

**Statutes**

19 U.S.C. § 1677.................................................................................................... *passim*

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994)..........................17

**Other Authorities**

19 C.F.R. § 351.503(b) .......................................................................................... *passim*

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results
   of Countervailing Duty Administrative Review; 2018*,
   86 Fed. Reg. 47,621 (August 26, 2021) ...................................................4, 5, 6, 13

*Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea:
   Preliminary Results of Countervailing Duty Administrative Review; 2011*,
   78 Fed. Reg. 55,241 (Dep't Commerce Sept. 10, 2013) ................................... 17-19

*Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-
   Rolled Carbon Steel Flat Products from the Republic of Korea*,
   67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002) ...........................................17

## I.    __INTRODUCTION__

On behalf of Hyundai Steel Company ("Hyundai Steel"), we hereby submit comments on the U.S. Department of Commerce's ("Commerce") April 10, 2023 Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Ct. No. 21-00536 (Ct. Int'l Trade April 10, 2023),  Final Remand Results, ECF No. 48 ("Final Remand"), PRR 7.[1]  The underlying administrative determination at issue is *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 47,621 (August 26, 2021) ("*Final Results*"), PR 177, and accompanying Issues and Decision Memorandum ("*Final Results* IDM"), PR 176.

Hyundai Steel agrees with the Final Remand's analysis of the Reduction for Sewerage Fees program and finding that the program is not countervailable.[2]  Hyundai Steel thus does not comment on that aspect of the Final Remand, and urges the Court to affirm it.

However, the Final Remand continues to be unsupported by substantial evidence and is otherwise not in accordance with law for the Provision of Port Usage Rights at the Port of Incheon program ("Port Rights Program"), and fails to comply with Slip Op. 23-15.[3]  The Court directed Commerce to consider the "other conditions of purchase or sale" surrounding the Port

---

[1] Citations to the administrative record shall be to the public record number ("PR"), the confidential record number ("CR"), the public remand record number ("PRR") or the confidential remand record number ("CRR").  *See* Administrative Record Index, *Hyundai Steel Co.  v. United States*, No. 21-00536 (Nov. 19, 2021), ECF No. 21; Remand Record Submission for the Final Results of Redetermination, *Hyundai Steel Co.  v. United States*, No. 21-00536 (Apr. 21, 2023), ECF No. 49.

[2] Hyundai Steel's arguments regarding this program were fully set out in its Rule 56.2 Brief, and those arguments support the redetermination made by Commerce here.

[3] The Court's decision was narrow and did not address all the arguments made by Hyundai Steel in its Rule 56.2 brief.  Hyundai Steel has thus primarily focused its comments on the Court's remand and the arguments made by Commerce in the *Final Remand*.  However, Hyundai Steel does not waive or otherwise abandon the arguments regarding this program that are fully set out in its Rule 56.2 Brief.

Rights Program.  Instead of doing so Commerce has gone to great lengths to explain that it is not

required to consider the context or conditions of purchase or sale, but can instead just myopically

look at the Port Rights Program in isolation.  This was error, and the *Final Remand* remains

unsupported by substantial evidence and is otherwise not in accordance with law.  The Court

should thus remand the case back to Commerce with directions to consider the undisputed fact

that the Government of Korea ("GOK") granted Hyundai Steel port rights as reimbursement for

construction costs incurred by Hyundai Steel prior to reverting ownership to the GOK, and that

reimbursements were not excessive.  This factual context supports the conclusion that the Port

Rights Program did not provide Hyundai Steel with a countervailable benefit.

## II.   <u>ARGUMENT</u>

### A.   The *Final Remand* Wrongly Characterizes The Basis For Its Port Rights Program Benefit Determination.

The Court took Commerce at its word in terms of how Commerce described the basis for

its benefit determination for the Port Rights Program.  In the *Final Results*, Commerce described

its benefit determination as follows:

> We further clarify that the treatment of the benefit received here is further
> supported by Commerce's regulations at 19 CFR 351.503(b), which states that for
> other government programs, <u>Commerce normally will consider a benefit to be
> conferred</u> where a firm pays less for its inputs (*e.g.,* money, a good, or a service)
> than it otherwise would pay in the absence of the government program, or
> receives more revenues that it would otherwise earn.  Here, Hyundai Steel was
> able to collect berthing fees and other fees and was not required to transmit those
> fees to the GOK.  Thus, a benefit was conferred under 19 CFR 351.503(b) under
> this program.

PR 176 at 21 (emphasis added).

Although 19 C.F.R. § 351.503(b) relates to "Other Subsidies" and is not directly linked to

the benefit description for the provision of goods or services for less than adequate remuneration

("LTAR") or more than adequate remuneration ("MTAR") in 19 U.S.C. § 1677(5)(E), the

language in the regulation as described by Commerce mimics the LTAR and MTAR benefit statutory provision. *Compare* 19 C.F.R. § 351.503(b) (benefit conferred where firm pays less for its inputs or receives more revenue that it would otherwise earn) *with* 19 U.S.C. § 1677(5)(E) (benefit conferred if goods or services provided for LTAR or if goods are purchased for MTAR). The Court thus sensibly concluded that Commerce's benefit determination was one related to the adequacy of remuneration, and thus Commerce was required to consider the port usage rights program based on prevailing market conditions. *See* Slip Op. 23-15 at 9-10 ("The statute provides that when Commerce reviews whether a benefit is conferred, 'adequacy of remuneration is determined in relation to prevailing market conditions.'" 19 U.S.C. § 1677(5)(E)).

The Court's interpretation of Commerce's benefit determination as one that was or should have been examined for adequacy of remuneration in consideration of prevailing market conditions is further supported by Commerce's description of the nature of the benefit in the *Final Results* as the non-payment of port usage fees. Specifically, Commerce stated that "the record is clear that the GOK is not collecting fees that it is entitled to collect" and that "Hyundai Steel has the right to use the port for free for about 41 years." PR 176 at 20. Most directly, Commerce stated "Hence, consistent with that determination, as upheld by the CAFC, we continue to find that non-payment of port usage fees constitutes a countervailable benefit." *Id.* In light of this description of the benefit, the Court reasonably concluded that Commerce was or should have been conducting an LTAR analysis as the free usage of the port element was tantamount to the GOK providing usage of the port for LTAR.

In the *Final Remand*, Commerce fails to meaningfully grapple with its own description of the benefit determination and instead seeks to distract by focusing on the fact that it treated the

5

*financial contribution* component of this subsidy as being based on "revenue foregone" under 19

U.S.C.§ 1677(5)(D)(ii).  *See* PRR 7 at 14.[4]  More specifically, Commerce argues that since its

financial contribution determination was based on revenue foregone, the requirement to consider

"prevailing market conditions" does not apply since that provision is limited to LTAR (or

MTAR) benefit determinations under 19 U.S.C. § 1677(5)(D)(iii) (LTAR) and (5)(D)(iv)

(MTAR).  *Id.*[5]  This argument is misplaced and disregards the Court's decision.

As an initial matter, Commerce's assertion that the prevailing market conditions clause of

section 771(5)(E) <u>only</u> applies to LTAR or MTAR financial contributions is not supported by the

plain language of the statute.  *See* PRR 7 at 14.  There is no discussion in the financial

contribution section at section 771(5)(D) or the benefit section at section 771(5)(E) that directly

links the prevailing market conditions requirement to LTAR or MTAR <u>financial contribution</u>

determinations.  Instead, the prevailing market conditions language in section 771(5)(E)(iv) only

references clause (iv) of the <u>benefit</u> determination and the provision of goods or services.  There

is no cross-reference to the various types of enumerated financial contributions in section

771(5)(D).  The Court thus appears to have reasonably concluded that since the language in 19

---

[4] Commerce's acknowledgment of the basis for its benefit determination was relegated to a footnote where it tries to walk back the fact that it specifically cited to the language in 19 C.F.R. § 351.503(b) that mimics the LTAR and MTAR statutory language.  *See* PRR 7 at 20, n. 79.  While Commerce may wish to takeback what it said in the Final IDM, the explanations provided in the Final Remand is post-hoc and does not change the fact that the basis for its benefit determination was the language in its regulation that tracks the LTAR and MTAR statute. And while Commerce emphasizes that it was highlighting the final phrase of the regulatory quotation – "relating to a company's ability to 'receive{} more revenue than it otherwise would earn" – this language tracks the MTAR language in the statute.  PRR 7. The requirement to consider the prevailing market conditions also applies to MTAR and so this is a distinction without a difference.

[5] Commerce itself acknowledges that a "government fee or charge paid by a respondent company with respect to the provision of a good or service, under certain circumstances, can be considered a financial contribution within the meaning of section 771(5)(D)(iii) of the Act."  PRR 7 at 17, n. 71.  That is, as an LTAR or MTAR based financial contribution.

C.F.R. § 351.503(b) mimics the LTAR and MTAR benefit language, the requirement to consider

prevailing market conditions applies equally to such benefit determination.  Nothing in the

statute prohibits that interpretation.

Having said that, the Court's decision was limited to its consideration of the benefit

determination which, as discussed above was based on the language of 19 C.F.R. § 351.503(b)

that mimics the LTAR and MTAR language of the statute.  The Court held that Commerce was

required to:

> consider information . . . regarding adequate remuneration for port usage in
> relation to the prevailing market conditions, such as 'price, quality, availability,
> marketability, transportation, and *other conditions of purchase or sale*,' 19 U.S.C.
> § 1677(5)(E) (emphasis added), and an analysis of the record evidence to
> determine that the Government of Korea provided usage of the port for less than
> adequate remuneration.

Slip Op. 23-15 at 10.  Commerce ignored this aspect of the Court's holding by focusing only

upon the financial contribution aspect of its decision and ignoring its own stated basis for the

benefit determination.  Instead, Commerce must analyze the Port Rights Program to determine if

Hyundai Steel paid less for those rights than it would otherwise pay in the absence of the

program, or received more revenues than it otherwise would earn.  *See* PR 176 at 21 (citing 19

C.F.R. § 351.503(b)).  That determination must be made by considering the prevailing market

conditions, including "other conditions of purchase or sale . . . ."  Slip Op. 23-15 at 10 (quoting

19 U.S.C. § 1677(5)(E)).

The "other conditions of purchase or sale" in this case include the undisputed fact that the

Government of Korea provided the port rights to Hyundai Steel as reimbursement for the costs

incurred by Hyundai Steel in building the port, ownership of which was reverted to the GOK.

More specifically, Korean law requires that certain infrastructure be under government control,

including harbors, wharfs, and related infrastructure.  CR 95-102 (PR 95-101) at Exhibit SQ1 K-

Water-1 (providing Article 15 of the Harbor Act, which states that "ownership of land developed or harbor facilities installed . . . shall vest in the State upon completion of the harbor project"). However, the GOK seeks to have private entities shoulder the costs to construct such infrastructure at their own expense through the Harbor Act and the Act on the Private Participation in Infrastructure to relieve the national budget.  CR 163-64 (PR 129-30) at Exhibit PPP-1.  In 2001, Hyundai Steel entered into an agreement with the Ministry of Oceans and Fisheries to construct a wharf at North Incheon Harbor.  CR 51-69 (PR 61-70) at 42.  Under the agreement, the GOK incurred no direct expenses in relation to the construction of the port facility, *id.*, while the construction costs were borne by Hyundai Steel. CR 163-64 (PR 129-30) at 3-4.[6]  As compensation for its construction costs, Hyundai Steel and the GOK agreed to a reimbursement schedule, under which Hyundai Steel acquired the right to operate and use the harbor facility and collect certain fees until its construction costs had been repaid.  CR 51-69 (PR 61-70) Exhibit G-1, Exhibit G-2.  The parties calculated, based on future fees estimated at the time of the agreement, that it would take 41 years and 8 months, or up to and including 2047, to compensate Hyundai Steel for the construction costs.  CR 163-64 (PR 129-30) at 7-8.

In the *Final Remand*, Commerce must take into consideration "the{se} other conditions of purchase or sale" as these facts show that the port rights were provided to Hyundai Steel as compensation for its construction costs, and the length of the port rights was calibrated so that Hyundai Steel would recoup its costs and nothing more.  The port rights did not give Hyundai Steel ownership type rights to the port as the record shows that Hyundai Steel was required to pay usage fees related to its own usage of the port.  CR 51-69 (PR 61-70) at 45, Exhibit G-9; CR

---

[6] The only GOK contributions during construction of the facility were grants that Hyundai Steel received over the five-year construction period totaling **[            ]** KRW, which covered only a fraction of the costs to construct the port.  CR 51-69 (PR 61-70) at 42.

120-59 (PR 106) at 24-25, Ex. G-27.  Contrary to Commerce's characterizations in the *Final*

*Remand*, PRR 7 at 13 nn.55-57, Hyundai Steel has not been granted free use of the port.  CR

165-66 (PR 131) at 11.  The port rights thus did not result in Hyundai Steel paying less for inputs

than it would otherwise pay, or receiving more revenue than it would otherwise earn, but instead

simply made Hyundai Steel whole for the costs it incurred in building the port before reverting

ownership to the GOK.  Viewed in light of these other conditions of purchase or sale, it is plain

that the port rights that the GOK provided to Hyundai Steel did not provide a countervailable

benefit.

Although the Court's decision was tethered to the prevailing market conditions language

in 19 U.S.C. § 1677(5)(E)(iv) (*e.g.,* Slip Op. 23-15 at 10), the Court's decision is also supported

by the legal principles discussed in *Government of Sri Lanka v. United States*, 308 F. Supp. 3d

1373 (Ct. Int'l Trade 2018) ("*GOSL*").[7]   As discussed in Hyundai Steel's Rule 56.2 Brief, the

principles in that case require Commerce to analyze the GOK's provision of port rights to

Hyundai Steel as part of the overall Port Rights Program.  *See* Hyundai Steel Rule 56.2 Brief at

21-24, *Hyundai Steel Company v. United States*, Ct. No. 21-00536 (Ct. Int'l Trade Mar. 21,

---

[7] In response to Hyundai Steel's reliance on the *GOSL* case as support for the Court's conclusion that Commerce had to consider the other conditions of purchase/sale as part of its subsidy analysis, Commerce seeks to distinguish the *GOSL* case.  *See* PRR 7 at 34, n. 124.  The distinction drawn by Commerce is that here, unlike in *GOSL*, the GOK did not require Hyundai to build a port to benefit other recipients and that Hyundai Steel benefitted from building the port.  *See id.*  However, the fact that the GOK did not *require* Hyundai Steel to build the port is not a relevant factor to the *GOSL* analysis.  The respondent in *GOSL* was "not required to rely on locally-sourced rubber," *GOSL*, 308 F. Supp. 3d at 1379 n. 3, but if it did, it was required to pay the above-market guaranteed price and wait to be reimbursed by the Government of Sri Lanka. It is thus plain that the rubber program in *GOSL* was not mandatory and the respondent was not *required* to participate.  Furthermore, the respondent in *GOSL* did benefit from buying rubber as it was necessary to its business, just as the port was relevant to Hyundai Steel's business.  The only detriment to the respondent was that it had to pay above market prices for the rubber and then wait to be reimbursed by the government.  So too here Hyundai Steel had to build the port, revert ownership to the GOK, and then wait over 41 years to be reimbursed for its costs.  These cases are thus analogous.

2022), ECF No. 33 ("Hyundai Steel Rule 56.2 Br.") .  This includes the uncontested fact that the port rights were provided to Hyundai Steel by the GOK as reimbursement for the construction costs incurred in building the port prior to reverting ownership to the GOK.  CR 51-69 (PR 61-70) at 43.  This requirement to consider the program in its entirety is similar to the Court's holding that Commerce must consider "other conditions of purchase or sale" in determining whether the Port Rights Program provided a counervailable benefit to Hyundai Steel.  *See* Slip Op. 23-15 at 10.  Under either formulation, it is plain that the provision of port rights to Hyundai Steel did not result in a countervailable benefit because those rights were calibrated to reimburse Hyundai Steel for its construction costs and were not excessive.  CR 165-66 (PR 131) at 6-8.

Thus, whether framed in terms of the "other conditions of purchase or sale" language from 19 U.S.C. § 1677(5)(E) or the *GOSL* case that instructs that benefit determination should be made by looking at the overall program, the result is the same.  More specifically, the principles in *GOSL* support the conclusion that Commerce must consider the overall Port Rights Program, rather than a single "aspect of the program," PRR 7 at 13, when determining whether the program provides a benefit.  This is similar to the Court's directive that Commerce must consider the "other conditions of purchase or sale" that resulted in the GOK providing Hyundai Steel with the right to collect berthing income and port usage fees from third parties; namely, that Hyundai Steel had built the port and reverted ownership to the GOK.  These rights were given to Hyundai Steel to compensate it for its construction costs, and nothing more.  When these other conditions of purchase or sale are considered, it is plain that Commerce cannot lawfully treat the Port Rights Program as providing a countervailable benefit to Hyundai Steel.

Commerce also argues that it "did not conduct an LTAR analysis because such an analysis would be inappropriate in light of the facts and nature of the subsidy program at issue."

PRR 7 at 16.  "The ability to collect such fees (*i.e.,* fees otherwise payable to the government) cannot be construed as the provision of a good or service, but is instead revenue foregone."  *Id.* at 17.  As discussed, however, the revenue foregone aspect of Commerce's decision relates to the financial contribution component.  Here, the Court found that the GOK's provision of port rights to Hyundai Steel as reimbursement for construction costs was akin to the provision of a good or service for benefit purposes and thus is subject to the requirement in section 771(5)(E)(iv) to consider the prevailing market conditions, including "other conditions of purchase or sale."  *See* Slip Op. 23-15 at 10 ("Commerce did not consider information, however, regarding adequate remuneration for port usage in relation to the prevailing market conditions… and an analysis of the record evidence to determine that the Government of Korea provided usage of the port for less than adequate remuneration.").  The Court's interpretation of Commerce's decision was reasonable given the fact that its regulation mimics the LTAR/MTAR language of the statute.[8] *See* 19 C.F.R. §351.503(b) (a benefit can be conferred "where a firm pays less for inputs (e.g., money, a good, or a service) that it would otherwise pay . . . .").

B.   **Instead of Considering The "Other Conditions of Purchase or Sale" As Part of Its Analysis of The Port Rights Program, Commerce Focuses On Irrelevant Issues.**

As discussed, the Court found that Commerce's benefit determination was not supported by substantial evidence because it failed to consider the "other conditions of purchase or sale" as part of its analysis.  Slip Op. 23-15 at 10.  In response, Commerce seeks to sidestep this aspect of

---

[8] Commerce points to a snippet from Hyundai Steel's administrative case brief where it stated that the provision of port usage rights could not fit into any of the enumerated categories in 19 U.S.C. § 1677(5)(E).  *See* PRR 7 at 32.  However, no such argument was made by Hyundai Steel in briefing before this Court, and so there is no inconsistency in this litigation. Furthermore, the statement that Hyundai Steel made at the agency level was in support of the argument that Commerce had not adequately explained the basis for its benefit determination in the *Preliminary Results*.  *See* CR 191 (PR 170) at 9.  In the *Final Results* Commerce responded by citing to 19 C.F.R. § 351.503(b) to support if benefit determination.  *See* PR 176 at 21.

the Court's decision by reframing the issue of the costs incurred by Hyundai Steel in constructing the port (*i.e.,* the other condition of purchase or sale) in terms of statutory offsets under 19 U.S.C. § 1677(6).  That is, Commerce is seeking to characterize this "other condition of purchase or sale" as tantamount to a request for a statutory offset.  *See* PRR 7 at 20-21.  This is a red herring.   Neither Hyundai Steel nor the Court has ever argued or determined that consideration of the construction costs incurred by Hyundai Steel qualifies as one of the enumerated deductions from the gross countervailable subsidy amount.  Instead, the Court held that as part of its benefit analysis, Commerce must take into account the conditions that led to the GOK giving Hyundai Steel port rights.  *See* Slip Op. 23-15 at 10.  The issue of whether the consideration of the costs incurred by Hyundai Steel in building the port fits within any of the narrow statutory offsets is thus not the focus of the Court's decision.[9]

Commerce also seeks to focus on 19 U.S.C. § 1677(5)(C), which provides that Commerce is not required to consider the effect of the subsidy in determining whether a subsidy exists.  *See*  PRR 7 at 20-21.  This too is a red herring.  Hyundai Steel has not made any argument that Commerce is required to consider the effect of the GOK's provision of port rights on Hyundai Steel in determining if a countervailable benefit exists.  Nor did the Court discuss or even cite to 19 U.S.C. § 1677(5)(C) as part of its decision.  Instead, Hyundai Steel argued that Commerce must take into account the totality of the circumstances surrounding the GOK's provision of port rights to Hyundai Steel in determining whether Hyundai Steel received a countervailable benefit.  *See* Hyundai Steel Rule 56.2 Br. at 15-16, 21-22.  This includes the fact

---

[9] To the extent the statutory offset provision is at all relevant, the provision of port rights would qualify as a "similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy."  19 U.S.C. § 1677(6).  There is no question that "but for" Hyundai Steel constructing the port and reverting ownership to the GOK it would not have received port rights from the GOK.  This was the exchange.

that the port rights were provided to reimburse Hyundai Steel for the construction costs it incurred in building the port before reverting ownership to the GOK, and that the length of the port rights period was set so that Hyundai Steel would be reimbursed and nothing more.  *See id*. The Court similarly held that Commerce's treatment of the Port Rights Program as a benefit was not supported by substantial evidence because Commerce had not considered the "other conditions of purchase or sale" as part of its benefit analysis.  *See* Slip Op. 23-15 at 10.

 Commerce also seeks to bolster its subsidy offsets and subsidy effects analysis by citing two examples from the CVD Preamble.  *See* PRR 7 at 22-23.  These examples are inapposite. The first example relates to environmental restrictions imposed that require a firm to purchase new equipment to adapt its facilities and where the government gives subsidies to purchase the new equipment that do not fully offset the costs of the new equipment.  *Id.*  In this situation, Commerce makes the point that it can countervail the subsidy and does not have to consider that the overall effect of the government action is to increase the firm's costs.  *Id.*  This example is inapt because in that scenario the government action led to an improvement in the equipment and the government covered some of the cost.  Here, Hyundai Steel incurred costs to build the port but was required to revert ownership to the GOK.  It does not own the port as an asset, unlike the new equipment in the Preamble's example, and thus does not benefit from improvements funded in part by the GOK.  The same is true of the second example regarding safety regulations requiring automakers to install seat belts funded in part by the government.  The government requirement led to improvements to the car and the government covered some of the cost.  That is not the case with respect to the port built by Hyundai Steel and reverted to the GOK.  *See GOSL*, 308 F. Supp.3d at 1383-84 (discussing these two examples from the Preamble and concluding that they undercut the existence of countervailable benefit).

13

C.    **Commerce's Prior Decisions Sensibly Consider Whether The Reimbursement For Port Construction in Korea Is Excessive.**

Commerce seeks to dispute the existence of a so-called "excessive benefit" standard on the basis that Hyundai Steel relied on this standard as part of its original arguments at the Court of International Trade.  *See* PRR 7 at 23-26.  However, the Court's decision was not based on Hyundai's argument regarding the existence of an "excessive benefit" standard and thus this aspect of the *Final Remand* is outside the scope of the Court's remand decision.  *Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1337 (Ct. Int'l Trade 2017) (finding that remand results exceeded the scope of the remand order).   Nevertheless, in the interest of completeness Hyundai Steel briefly addresses some of the points below.

At the outset, Hyundai Steel notes that its discussion of the various cases regarding the excessive benefit standard was made in response to Commerce's reliance on those cases to support its treatment of the port rights program as providing recurring benefits.  *See* PR 176 at 19, n.91 ("Additionally, consistent with other proceedings, as well as prior segments of this proceeding, we have treated this program as a recurring program.").  The discussion of these cases and the excessive benefit standard by Hyundai Steel was thus in response and to demonstrate that these cases actually supported Hyundai Steel's position.  *See* Hyundai Steel Rule 56.2 Brief at 12-16.  Contrary to Commerce's position, these cases stand for the proposition that Commerce has previously analyzed port rights programs in Korea to determine if the reimbursement period is excessive.  This is a logical way to view these programs because if the port rights granted to the respondent do not exceed the costs incurred to build the port then there is no basis to determine that the respondent has received a countervailable benefit.

In the *Final Remand*, Commerce argues: "application of an 'excessive benefit' standard would be inconsistent with both the Act and the CVD regulations . . ." because it is not required

to consider the effects of the subsidy.  PRR 7 at 24 (citing 19 U.S.C. § 1677(5)(C)).  However, consideration of whether the reimbursement period leads to an "excessive benefit" to Hyundai Steel does not require any consideration of the "effects of the subsidy" on Hyundai Steel.  PRR 7 at 24.  The program at issue here is the GOK's reimbursement to Hyundai Steel for the costs Hyundai Steel incurred in building the port prior to reverting ownership to the GOK.  The question is thus not the effect of the reimbursements on Hyundai Steel's production or operations but instead whether the reimbursements exceeded the costs incurred by Hyundai Steel in building the port and thus provided a benefit.

Commerce also continues to insist that *AK Steel* supports its benefit analysis.  *See* PRR 7 at 25 (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1379-82 (Fed. Cir. 1999) ("AK Steel")).  However, the Court already found that while the "salient facts recounted in *AK Steel Corp.* may be similar to the facts in this case, the standard of review is whether Commerce's benefit determination is supported by substantial evidence, and the instant case differs from *AK Steel Corp.* in the evidence on the administrative record."  Slip Op. 23-15 at 8-9; PRR 7 at 25, n.94.  The Court's recognition of distinctions was correct.  Among other things, the program at issue in *AK Steel* involved the exemption of dockyard fees to the respondent POSCO as reimbursement for costs incurred in building a port berth that was reverted to the GOK.  Here, as discussed Hyundai Steel was not given free usage of the port or any exemption from usage fees.  Instead, Hyundai Steel was given the right to collect fees from users of the port as compensation for building a port that was reverted to the GOK.  This is an important factual distinction because in *AK Steel* the respondent was arguably given ownership type rights via free usage, whereas here Hyundai Steel paid for usage of the port and was only given the right to collect certain fees from third-party users of the port as reimbursement.

Furthermore, aside from the Court's finding that the instant case differs from *AK Steel* based on the different administrative record (Slip Op. 23-15 at 9), *AK Steel* involved a Commerce decision from 1993 and thus was decided under pre-URAA law.[10]  In particular, the URAA amended the applicable countervailing duty statute by adding a subsection (E) to Section 771(5) and thereby created a statutory definition of "benefit conferred," which, prior to the URAA had not been a statutory requirement.  *Compare* 19 U.S.C. § 1677(5)(E) (1994), *with* 19 U.S.C. § 1677(5) (1988); *see also* 108 Stat. at 4902-03 (amending paragraph (5) of Section 771).  Accordingly, the 1993 determination in *Steel Products from Korea* and, by extension *AK Steel*, did not determine whether the exemption from dockyard fees constituted a benefit conferred as defined in 19 U.S.C. § 1677(5)(E) because the subsection did not exist at the time.

Commerce next claims that "Hyundai Steel mischaracterized key holdings in the prior cases" because, according to Commerce these cases such as *CR from Korea 2000* and *CORE from Korea 2011 Preliminary Results* discussed the "excessive" period for specificity purposes and not benefit.  *See* PRR 7 at 24-25; *see also Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002) ("*CR from Korea 2000*");  *Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review*; 2011, 78 Fed. Reg. 55,241 (Dep't Commerce Sept. 10, 2013) ("*CORE from Korea 2011 Preliminary Results*").  Contrary to Commerce's claims, *CR from Korea 2000* was not limited to specificity.  In that case, Commerce noted that the AUL of the assets "is much less than" the seventy year period during which Dongbu was exempt from paying the usage fees.  *CR from Korea 2000* at Comment 11.  Commerce then explicitly found

---

[10] The URAA was enacted in 1994 and, *inter alia*, amended domestic countervailing duty laws.  Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).

16

that Dongbu "receiv{ed} a *benefit* from the GOK by not having to pay usage fees for the use of the port berth for such an extended time period." *Id.* (emphasis added). Thus, consideration of the "excessive benefit" in *CR from Korea 2000* was related to the existence of a benefit, and does not appear to have any relevance to the specificity determination. Furthermore, in *CORE from Korea 2011 Preliminary Results* Commerce did not limit its linkage of the "excessive" period to just specificity but also referenced it in relation to financial contribution. *See CORE from Korea 2011 Preliminary Results* at 11 ("the GOK is foregoing revenue that it would otherwise collect by allowing Dongbu to be exempt from the port charges for up to 70 years…"). Although the benefit discussion does not specifically mention the excessive period, the benefit calculation was the amount of port charges that were not collected and thus is linked to the financial contribution determination that is based on the excessive period.

Commerce also argues that even if the excessive benefit standard is applicable the outcome would be the same. *See* PRR 7 at 26-27. Specifically, Commerce argues that the length of the GOK's provision of port rights to Hyundai Steel is equal to or exceeds the average useful life ("AUL") of the port that Hyundai Steel built and thus is excessive. *See id.* However, this is based on references to various AULs listed in Hyundai Steel's financial statements that in some instances are up to 50 years and so this does not demonstrate that the 41 years and 8 months of port rights granted to Hyundai Steel exceeded the AUL period. *See id.* (Hyundai Steel's financial statements "indicated that buildings, structures, and machinery have estimated useful lives of <u>15 to 50 years</u> . . . .") (emphasis added).[11] More importantly, however, the AUL period

---

[11] Commerce references the fact that in Hyundai Steel's financial statements it considered the intangible asset of "exclusive dock use rights" to have an estimated useful life of 42 years as support for its point that the length of the Hyundai Steel/GOK agreement for port rights was equal to or exceeded the AUL. PRR 7 at 27. This is misleading. The reference to the useful life of the exclusive dock use rights just mirrors the length of the port usage rights, which was 41

is just one barometer that was used by Commerce in these cases to determine whether the provision of rights was so long as to effectively give ownership to the respondent.  Here, Hyundai Steel was not even granted the right to use the port for free and thus regardless of the length of its right to collect berthing income and usage fees from other third party users of the port it was not given any ownership-type rights to the port.  CR 120-59 (PR 106) at 24-25, Exhibit G-27.  Instead, it had to pay for its own usage of the port and was granted no free usage rights that could be construed as ownership type rights.

---

years and 8 months.  This does not have any relevance to the AUL period for the tangible asset of the port itself.

## III.      <u>CONCLUSION</u>

Based on the foregoing, Hyundai Steel respectfully requests that this Court (i) hold that Commerce's *Final Remand* is unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Hyundai Steel Company*

### <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 5,745 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

May 8, 2023